Mr. Justice GRIER.
There are certain propositions of law which' must necessarily affect the ultimate decision of these cases, and many others, which it will be proper to discuss and decide before we notice the special facts peculiar to each.
. They are, 1st. Had the President a right to institute a blockade of ports in possession of persons in armed rebellion against the Government, on the principles of international law, as known and acknowledged among civilized States?
2d. Was the property of persons domiciled or residing within those States a proper subject of capture on the sea as “enemies’ property ?”
I, Neutrals have a right to challenge the existence of a blockade de facto, and also the authority of the party exercising the right to institute it. They have a right to enter the ports *666 of a friendly nation for. the purposes of trade. and commerce, but are bound to recognize the rights of a belligerent engaged in actual war, to use this mode of coercion, for the purpose of subduing the enemy.
That a blockade de facto actually existed, and was formally declared and notified by the President on the 27th and 30th of April, 1861, is an admitted fact in these cases.
That the President, as the Executive Chief of the .Government and Commander-in-chief of the Army and Navy, was the proper person to make such notification, has not been, and cannot be disputed.
The right of prize and capture has its origin in the “jus iellif and is goverend and adjudged under the law of nations. To legitimate the capture of a neutral vessel or property on the high seas, a war must exist de facto, and fhe neutral must have a knowledge or notice of the intention of one of the parties belligerent to use this mode of coercion against a port, city, or territory, in possession of the other.
Let us enquire whether, at the time this blockade was instituted, a state of war existed which would justify a resort to these means of subduing the hostile force.
War has- been well defined to be, “ That state in which a nation prosecutes its right by force.”
The parties belligerent in a public war are independent nations. But it is not necessary to constitute war, that both parties should be acknowledged as independent nations or sovereign States. A war may exist where one of the belligerents, claims sovereign rights as against the other.
Insurrection against a government may or may not culminate in.an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government. A civil war is never solemnly declared; it becomes such by its accidents — the number, power, and organization of the persons who originate and carry it on. When the party in rebellion occupy and hold in a hostile manner a certain portion of territory ; have declared their independence; have cast off theii allegiance; have organized armies; have commenced hostilities *667 ■ against their former sovereign, the world acknowledges them as belligerents, and the contest a war. They claim to be in arms to establish their liberty and independence, in order to become sovereign State, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for their treason.
The laws of war, as established among nations, have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war. Hence the parties to a civil war' usually concede to each other belligerent rights. They exchange prisoners, and adopt the other courtesies and rules common to public or national wars.
“A civil war,” says Yattel, “breaks the bands of society and government, or at least suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as constituting, at least for a time, two separate bodies, two distinct societies. Having no common superior to judge between them, they stand in precisely the same predicament as two nations who engage in a contest and have recourse to arms.
“ This being tbe case, it is very evident that the common laws of war — those maxims of humanity, moderation, and honor— ought to be observed by both parties in every civil war. Should the' sovereign conceive he has a right to hang up his prisoners as rebels, the opposite party will make reprisals, &c., &e.; the war will become cruel, horrible, and every day more destructive to the nation.”
As a civil war is never publicly proclaimed, eo nomine against insurgents, its actual existence is a fact in our domestic history which the Court is bound to notice and to know.
The true test of its existence, as found in the writing of the sages of the common law, may be thus summarily stated: “When the-regular course of justice is interrupted by revolt, rebellion, dr insurrection, so that the Ccurts of Justice cannot be kept open, civil war exists and hostilities may be prosecuted *668 on the same footing as if those opposing the Government were • foreign enemies invading the land.”
By the Constitution, Congress alone has the power to declare a national or foreign war.' It cannot declare war against a State, or any number of States, by virtue of any clause in the Constitution. The Constitution confers on the President the whole Executive .power. lie is bound to take care that the laws be faithfully executed. . lie is Commander-in-chief of the Army and Navy of the Unjted States, and of the militia of the several States when called into the actual service of the United States. He has no power to initiate or declare a war either against a foreign nation or a domestic State. But by the Acts of Congress of February 28th, 1795, and 3d of March, 1807, he is authorized to called out the militia and use the military and naval forces of the United States in case of invasion by foreign nations, and to suppress insurrection .against the- government of a State or of the United States.
If a war be made by invasion of a foreign nation, thé President is not only authorized but bound to resist force by force. He does not' initiate the war, but is bound to accept the challenge without waiting for any special legislative authority. And whether the hostile party be a foreign invader, or States organ ■ ized in rebellion, it is none the less a war, although the declaration of it be “ unilateral.” Lord Stowell (1 Dodson, 247) observes, ' I*t is not the less a war on that account, for war may exist without a declaration on either side. It is so laid down by the best writers on the law of nations. A declaration or war by one country only, is not a mere challenge to be accepted or refused. at pleasure by the other.”
The battles of Palo Alto and Resaca de la Palma had been fought before the passage of' the Act of Congress of May 13th, 1846, which recognized “a state of war as existing by the act of ■ i\e Republic of Mexico.” This act not only provided for the future prosecution of the war, but was itself a vindication and ratification of the Act of the President in accepting the challenge without a previous formal declaration of war by Congress.
This greatest of civil wars was not gradually developed by *669 popular commotion, tumultuous assemblies, or local unorganized insurrections. However long may have been its previous con ception, it nevertheless sprung forth suddenly from the parent brain, a Minerva in the full panoply of war. The President was bound to meet it in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact.
It is not the less a civil war, with belligerent parties in hostile array, because it may be called an “ insurrection” by one side, and the insurgents be considered as rebels or traitors. It is not necessary that the independence of the revolted province or State be acknowledged in order to constitute it a party belligerent in a war according to the law of nations. Foreign nations acknowledge it as war by a declaration of neutrality. The condition of neutrality cannot exist unless there be two belligerent -parties. In the case of the Santissima Trinidad, (7 Wheaton, 337,) this Court say: “The Government of thé United States has recognized the' existence of a civil- war between Spain and her 'colonies, and has avowed her determination to remain neutral- between the parties. Each party is therefore deemed by us a belligerent nation, having, so far as concerns us, the sovereign rights of war.” (See also 3 Binn., 252.)
As soon as the news of the attack on Fort Sumter, and the organization of a government by the seceding States, assuming to' act as belligerents, could become known in Europe, to wit, on the 13th of May, 1861, the Queen of England issued- her proclamation of- neutrality, “recognizing hostilities as existing between- the Government. of the United States of America and certain States styling themselves the Confederate States of America.” This was immediately followed by similar declarations or silent acquiescence by other nations.
After such an official recognition by the sovereign, a citizen of- a foreign State is estopped to deny the existence of a war "with all its.consequences as regards neutrals. They cannot ask a Court to affect a technical ignorance of the existence of a war, which all the world acknowledges to be the greatest - civil war Known in the history of the human race, and thus cripple the *670 arm of-the Government, and paralyze its power by subtle definitions and ingenious sophisms.
The law of nations is also called the law of nature; it is founded on the common consent as well as the common sense of the world. It contains no such anomalous doctrine as that which this Court are now for the first time desired to pronounce, to wit: That insurgents who have risen in rebellion against their sovereign, expelled her Courts, established a revolutionary government, organized armies, and commenced hostilities, are not enemies because they áre traitors; and a war levied on the Government by traitors, in order to dismember and destroy it, is not a war because it is an “ insurrection.”
Whether the President in fulfilling his duties, as Commander in-chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions as will compel him to accord to them the character oí belligerents, is a question to be decided by him, and this Court must be governed by the decisions and acts of the political department of the Government to which this ■ power was entrusted. “ He ■ must determine what degree of force the crisis demands.” The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case.
The correspondence of Lord -Lyons with the Secretary of State admits the fact and concludes the question.
If it were necessary to the technical existence of a war, that it should have a legislative sanction, we find it in almost every act passed at the extraordinary session of the Legislature of 1861, which was wholly employed in enacting laws to enable the Government to prosecute the war with vigor and efficiency. And- finally, in 1861, we find Congress “ex majore cautela” and in .anticipation of such astute objections, passing an act “approv- ■ ing, legalizing, and making valid all the acts, proclamations, and orders of the President, &c., as if they had been issued and done under the previous express authority and direction of the Congress of the United.States.”
*671 Without admitting that such an act was necessary under the circumstances, it is plain that if the President had in any manner assumed powers which it was necessary should have the authority or sanction of Congress, that on the well known principle oí law, " omnis ratihabüio retrotrahitur et mandato equiparatur," this ratification has operated to perfectly cure the defect. In the case of Brown vs. United States, (8 Cr., 131, 132, 133,) Mr. Justice .Story treats of this subject, and cites numerous authorities to which we may refer to prove this position, and concludes, “ I am perfectly satisfied that no subject can commence hostilities or capture property of an enemy, when the sovereign has prohibited it. But suppose he did, I would ask if the sovereign may not ratify his proceedings, and thus by a retroactive operation give validity to them ?”
Although Mr. Justice Story dissented from the majority of the Court on the whole case, the doctrine stated by him on this point is correct and fully substantiated by authority.
The objection made to this act of ratification, that it is expost facto, and therefore unconstitutional and void, might possibly have some weight on the trial of an indictment in a criminal Court. But precedents from that source cañnot be received as • authoritative in a tribunal administering public and international law.
On this first question therefore we are of the opinion that the President had a right, jure belli, to institute, a blockade of ports in possession of the States in rebellion, which neutrals are bound to regard.
II. We come now to the consiueration of the second question. What is included in the term “ enemies' property ?"
Is the property of all persons residing within the territory of the States nc w in rebellion, captured on the high seas, to be treated as “ enemies’ property” whether the owner be in arms against the Government or not ?
The right of one belligerent not only to coerce the other by direct force, but also to cripple his resources by the seizure or destruction of his property, is a necessary result of a state' of war. Money and wealth, the products of agriculture and com *672 .merce, áre said to be tbe sinews of war, and as necessary in its conduct as numbers and physical force. Hence it is, that the laws of war recognize the right of a belligerent to cut the.se sinews of the power of the enemy, by capturing his property on the high .seas.
The appellants contend that the term “ enemy” is properly applicable to those only who are subjects or citizens of a foreign State at war with our own. They quote from the pages of the common law' which say, “ that persons who wage war against the King may be of two kinds, subjects or citizens. The former are not proper enemies, but rebels and traitors; the latter aie those that come properly under the name of enemies.”
They insist, moreover, that tbe President himself, in his proclamation, admits that great numbers of the persons residing within the territories in possession of the insurgent government, are_ loyal in their feelings, and forced by compulsion and the violence of the rebellious and revolutionary party and its “ de facto government” to submit to their laws and assist in their scheme of revolution; that the acts of the usurping government cannot legally sever the bond of their allegiance; they have, therefore, a co-relative right to claim the protection of the government for their persons and property, and to be treated as loyal citizens, till legally convicted of having renounced their allegiance and made war against the Government by treasonably resisting its laws.
They contend, also, that insurrection is the act of individuals ' and not of a government or sovereignty; that the individuals engaged are subjects of law. That confiscation of their property can be -effected only under a municipal law. That by the law of the land such confiscation cannot take place without the conviction of the owner of some offence, and finally that the secession ordinances are nullities and ineffectual to release any citizen from his allegiance to the national Government, and consequently that the Constitution and Laws of the United States are still operative over persons in all the States, for punishment as well as protection
This argument, rests on the assumption of two propositions *673 each.of which is without foundation on the established law of nations. It assumes that where a civil war exists, the party belligerent claiming to be sovereign, cannot, for some unknown reason, exercise the rights of belligerents, although the revolutionary party .may. Being sovereign, he can exercise only sovereign rights, over the other party. The insurgent may be killed on the battle-field or by the executioner; his property on land may be confiscated under the municipal law; but the commerce on the ocean, which supplies the rebels with means to support the war, cannot be made the subject of capture under the laws of war, because it is “ unconstitutional! 1 /” Now, it is a proposition never doubted, that the belligerent party who claims to be sovereign, may exercise both belligerent and sovereign rights, (see 4 Cr., 272.) Treating the other party as a belligerent and using only the milder modes of coercion which the law of nations has introduced to mitigate the rigors of war, cannot be a subject of complaint by the party to whom it is accorded as a grace or granted as a necessity. We have shown that a civil war such as that now waged between the Northern and Southern States is properly conducted according to the humane regulations of public law as regards capture on the ocean.
Under the very peculiar Constitution of this Government, although the citizens owe supreme allegiance to the Federal Government, they owe also a qualified allegiance, to.the State in which they are domiciled. Their persons and property are subject to its laws.
Hence, in organizing this rebellion, they have acted as States claiming to be sovereign over all persons and property- within their respective limits, and asserting a right- to absolve their citizéns from their allegiance to the Federal Government. Several of these States have combined to form a new confederacy, claiming to be- acknowledged by the world as a' sovereign State. Théir right to do so is now being decided by wager of battle. The ports and territory of each of these States are held in hostility to the General Government. It is no loose, unorganized insurrection, having no defined boundary or possession. It has *674 » boundary marked by lines of bayonets, and which can be ..crossed only by force — -south of this line is enemies’ territory, because it is claimed and held in possession by an organized, hostile and belligerent power.
All persons residing within this territory whose property may be used to increase the revenues of the hostile power are, in this contest, liable to be treated as enemies, though not foreigners. They have cast off their allegiance and made war on their Government, and are none the less enemies because they are traitors!
But in defining the meaning of the term “ enemies’ property,” we will be led into error if we refer to Fleta and Lord Coke for their definition- of the word “ enemy.” It is a technical phra'se peculiar to prize courts, and depends upon principles of public policy as distinguished from the common law.
Whether property be liable to capture as “ enemies’ property” does not in any manner depend on the personal allegiance of the owner. “ It is the illegal traffic that stamps it as ‘ enemies’ property.’ • It is is- of - no consequence whether it belongs to an ally or a citizen. 8 Cr., 384. The owner, pro hac vice, is an enemy.”' 3 Wash. C. C. R., 183.
The' produce of the soil of the hostile territory, as well as other property engaged in. the commerce of the hostile power, as .the source of its wealth and strength, are always regarded as legitimate prize, without regard to the domicil of the' owner, and much more so' if he reside and trade within their territory.
III. We howproceed to notice the facts peculiar to the several cases submitted .for our consideration. The principles which have just been stated apply alike to all of them.
I. The case of 'the brig'Amy Warwick.
This vessel was captured upon the high seas by the United, States gunboat Quaker 'City, and with her cargo was sent- into the district of Massachusetts for condemnation. The brig was claimed' by David Currie and others. The cargo consisted of coffee, and was claimed, four hundred bags by Edmund Daven port & Co., and four thousand seven hundred bags by Dunlap Moncuré & Co.' The title of these parties as respectively claimed *675 Was conceded. All the claimants at the time of the capture, and for a long time before, were residents of Richmond, Va., and were engaged in business there. Consequently, their property was. justly condemned as “ enemies’ property.”
The claim of Phipps & Co. for their advance was allowed by the Court below. That part of the decree was not appealed from and is not before us. The case presents no question but that of enemies’ property.
The decree below is affirmed with costs.
II. The case of the Hiawatha.
The Court below in decreeing against the claimants proceeded upon the ground that the cargo was shipped after notice of the blockade.
The fact is clearly established, and if there were no qualifying circumstances, would well warrant the decree. But after a careful examination of the correspondence of the State and Navy Departments, found in the record, we are not satisfied that the British Minister erred in the construction he put upon it, which was that a license was given to all vessels in the blockaded ports to depart with their cargoes within fifteen days after the blockade was established, whether the cargoes were taken on board before or after the notice of the blockade. All reasonable doubts should be resolved in favor of the claimants. Any other course' would be inconsistent with the right administration of the law and'the character of a just Government. But the record discloses another ground upon which the decree must be sustained. On the 19th of April the President issiied a proclamation announcing his intention to blockade the ports of the several States therein named.
On the 27th of April he issued a further proclamation announcing his intention to blockade the ports of Virginia and North Carolina in addition to those of the States named in the previous one. On the 30th of April Commodore Pendergrast issued his proclamation announcing the blockade as established. These proclamations were communicated to the British Minister as soon as they were issued. On the 5th of May the British Consul at Richmond wrote to Lord Lyons that he had advised *676 those representing the owners of tbe Hiawatha that there would be no difficulty in her leaving in-ballast. He added, “ but to this they win not consent.” On the 8th of May Lord Lyons made an application to the Secretary of State relative to this vessel. The matter was referred to the Navy Department. On the same day the Secretary of the Navy replied: “ Fifteen days have been specified as a limit for neutrals to leave the ports after actual blockade has commenced, with or without cargo, and there are yet five or six days for neutrals to leave: with proper diligence on the part of “persons interested I see ftQ reason for exemption to any.” Here was a.distinct warning that the vessel- must leave withiii thé time limited, after the commencement of the blockade. On the 10th of May she completed the discharge of her cargo.
On the next day she commenced lading for her outer voyage, and by working night and day, on the 15th of May she had taken in a full cargo of cotton and .tobacco. On that day the British Consul, gave her a certificate, wheréin he referred to the proclamation of the 27th of April, “in which it was announced that a blockade would be enforced of the ports- of Virginia," and added, that “ the best information attainable ” “ pointed to .the 2d of.May as the day when'an efficient blockade was supposed to have been established.”
On the 16th of May she was ready for sea, but there was no steam-tug in port to tow her- down the river. At six o’clock, P. M., on the 17th she was taken in tow by the steam-tug David .-Currie. The tug had not. sufficient power and the Hiawatha came to anchor again.. On the 18th, at six o’clock, A. M., she was taken in tow by the steam-tug William Allison and towed “ out to sea. On the 20th of May she was captured in Hampton Loads off Fortress Monroe, and taken with her cargo into the Southern District of New York for condemnation.
The energy with which the labor of lading her was pressed evinces the consciousness of those concerned of the peril of delay beyond the time limited by the proclamation for her depar “ture. The time was fifteen days from the establishment of the ■ blockade. The blockade was effectual on the 80th of April. '
■ There is ho controversy upon the subject. The fifteen days *677 expired on the 15th of May — the day she completed her lading. A vessel being in a blockaded port is presumed to have notice of the blockade as soon as it commences. This is a settled rule in the law of nations.
The certificate of the Consul states, that according to his information the blockade commenced on the 2d of May. It is not easy to imagine how he could have arrived at this .conclusion. The James river is- a great commercial thoroughfare. It would seem that news of so important an event must have swept up its waters to Richmond, as news of interest spreads along the streets of a city. Such circumstances must have immediately become known to the parties as were sufficient to put them upon inquiry, and were therefore equivalent to full notice. But, conceding the 2d of May to be the day from which the computation is to be made, then, the fifteen days expired on the 17th of May-Her voyage down the river was not effectively begun until the 18th of May. This was after the expiration of the time allowed. In either view she became delinquent, and was guilty of a breach of the blockade. The proclamation allowed fifteen days — not fifteen days, and until a steam-tug could he procured. The difficulty of procuring a tug was one of the accidents which must have been foreseen and should have been provided for. Those concerned, notwithstanding the warnings they received, in their eagerness to. realize the profits of a full cargo, took the hazards of the adventure and must now bear the consequences. If she could overstay the time limited for a short period she could for a long one. Whatever the excess of time, the principle involved is the same.
It is insisted for the claimants that according to the President’s proclamation on the 19th of April, the Hiawatha was not liable to capture, until “ the commander of one of the blockading vessel” had “duly warned” her, endorsed "on her register the date and fact of such warning,” and she had again attempted “to leave the blockaded port.” To this proposition there are several answers:
1st. There is no such provision in the proclamation of the 27th of April touching the ports of Virginia.
*678 It simply announces that a blockade of those ports would be established.
2d. The proclamation of Commodore Pendergrast limits the warning to those who should approach the line of the blockade in ignorance of its-existence.. This action of the naval commander has not been disavowed by his Government, and is con elusive in a Prize Court. ' The warning proposed by this proclamation is according to the law of nations, and it is all that the law requires.
3d. If the provision referred to in the Proclamstion of the 19th of April be applicable to the ports of Virginia, it must be considered in the light of the surrounding circumstances.
It was intended for the benefit of the innocent, not of the guilty. It would be absurd to warn parties who had full previous knowledge. According to the construction contended for, a vessel seeking to evade the blockade might approach and retreat any number of times, and when caught her captors could do' nothing but warn her and endorse the warning upon heT registry. The same process might be repeated at every port on the blockaded coast. Indeed, according to the literal terms oí the proclamation, the Alabama might approach, and if captured, insist upon the warning and endorsement of her - registry, and then upon her discharge. A construction drawing after it consequences so absurb, is a “felo de se."
■ The cargo, must share the'fate of the vessel.
The decree below is affirmed with Costs.
III. The case of the Brilliante, No. 134, presents but little difficulty. This was a Mexican vessel, with a cargo belonging to Mexican citizens, seized on the 23d of June, 1861, in Biloxi Bay, in an attempt to escape from New Orleans by running the bio :kade, which had been established there by an efficient force on the 15th of May preceding. She was carried by. the captors to Key West, where she was libelled in the District Court of the United States for the Southern District of Florida, and condemned with her cargo as prize of war.
. '.From the deposition of Don Rafael Preeiat, who was part owner of the vessel and partner in the ownership of the cargo. *679 and also was on board from tbe .time she left-her home port ,at Campeche until her capture, the following facts may .be gathered.
In approaching New Orleans with a cargo from Sisal, she found the United States ship-of-war Brooklyn blockading the mouth of the Mississippi River at Pass a Loufre, and was by the officer of that vessel informed of the' .blockade and forbid to enter. The witness had a son at Spring Hill College, near Mobile, whom he desired to get away; and the Commander of the Brooklyn gave him a letter to the Commander of the Negara, recommending that he should be permitted to land and get his son. On leaving the Brooklyn she started along the coast in the direction of the Niagara, blit instead of seeking that vessel, she evaded her, and went to New Orleans by way of Lake Ponchartrain. At New Orleans she discharged her cargo and took in another, and in attempting to escape by the way she intended, was captured as already stated.
Some attempt has been made to excuse her entrance to New Orleans by showing that the crew refused to -proceed towards Mobile; but this is immaterial, as her condemnation is not for her successful entrance, but for her unsuccessful attempt to-escape,
It is also urged that she was entitled to warning at the -time of her capture, by virtue of the provision in the President’s proclamation establishing the blockade. But whatever may be the sound construction of that provision in reference to warning vessels in its application to vessels which had notice of .the blockade, the question does not arise in this case; because, from the statement of the owner of the vessel himself, she was warned by the officer of the Brooklyn.
The fact that the vessel’s register was not produced by either party to show a warning endorsed on it, can make no difference. It cannot be supposed that such endorsement on the ship’s register is to be the only evidence of warning; for if this were admitted, the vessel would only have to destroy her register, and with it the only evidence in which she could be condemned, or she would only need to keep several registers and destroy the one having the endorsement.
W e entertain no doubt that this vessel and cargo were justlj *680 condemned' as neutral property for running the blockade, of which she had been fairly warned, and which she had once successfully violated.
The judgment is therefore, affirmed.
■ The case of the Crenshaw, No. 168, on the other hand presents the question of “enemies’ property,” pure and simple. This vessel was seized in Hampton Roads on the 17th of May, 1861, by the blockading force at that point under flag-officer Stringham, and was carried as a prize of war into New York. The vessel and the larger part of the cargo were, at the time' of the capture, owned by citizens of the State of Virginia, residing in Richmond; and the vessel had on board, among her papers, a clearance sighed on the 14th of May by R. H. Lortin, Collector of the Port of. Richmond, of the Confederate States of America.
Upon the principles already, settled, the vessel and such parts of .her cargo as came within the description ■ of enemies’property, were rightfully condemned. ' It is however claimed that ten tierces of tobacco strips shipped by Ludlam &-Watson at Richmond, to be delivered, to shipper’s order at Liverpool, and thirty tierces.of tobacco strips shipped by W.- O. Clark at Richmond, to order, of Messrs, Sam’l Irven or assigns, Liverpool, are not enemies’- property, and should be restored to claimants.
The claim for the ten tierces, as itfterposed by Henry Ludlam .in behalf of himself and others, and the statement of the claimant’s' petition, are sworn to by Gustave Henikin, who holds the bill of lading,-.which is endorsed — “deliver to Ludlam & Henikin, for Chas. Lear & Sons’, Liverpool. Ludlam & Watson.”.
Mr. Henikin states that his partner, Henry Ludlam, was in Europe, that Watson, (the partner of Ludlam & Watson, resident in Richmond,) was out of .the jurisdiction of the Court, and that his knowledge- of the facts embraced in the petition is derived from his connections with it as partner of Ludlam, and from correspondence and business relations with the shippers. The. extent of his knowledge- thus set forth is not very satisfactory nor is the claim' stated in a manner to relieve it of any embarrassment growing out "of this fact. He sets forth substantially-that Ludlam & Watson, the shippers, was a firm composed of *681 Henry Ludlam, a citizen and resident of Rhode Island, and G. F. Watson, a citizen and resident of Richmond, Ya., doing business in Richmond; and that Henry Ludlam was also doing business in New York in partnership with Gustave Henikin, under the style of Ludlam & Henikin, and that Lear & Sons were a mercantile partnership, composed of British subjects, residing in-Liverpool. Then, speaking in behalf of all these parties, the petitioner says, they are owners of the ten tierces of tobacco, and bona fide owners of the bill of lading for the same, and that said tobacco was from the time of the shipment on board of the Crenshaw in the Port of Richmond, and still is the property of the claimants.
It will be seen at once, that the statement does not profess • to set out what are the distinct interests of each individual in this property, nor the separate -interests of the three partnership firms thus claiming it. Nor is there any attempt to show how any person beside Ludlam & Watson of Richmond, who were the shippers, acquired any interest in it. It is a joint claim on the part of all the persons mentioned, all of whom are asserted to be bona fide holders of the bill of lading. It is perfectly-consistent with all that was stated, that Ludlam & Watson were the real owners of the property. The bill. of lading, whiqh is to shipper’s order or assigns, throws no light on the subject, and there is not a particle of other testimony in reference to the claim in the record. The Court decreed that the interest of Lear & Sons in the ten tierces of tobacco be restored to them and that they pay costs, unless they furnished further proof that the property was bona fide neutral. They failed to furnish better proof and appealed on account of the costs.
We are of the opinion that the decree does them no injustice, and in.,the doubtful circumstances in which this claim stands, on their own statement, should have had great hesitation in giving them the property if the captors had appealed.
In reference to the claim of Ludlam, we are not sufficiently advised of what it is by his pleading or by the proof, to set apart for him, if it were just. But we are of the opinion that the firm of Ludlam & Watson, doing business in Richmond, where *682 Watson, the active member of the firm, resided, must be ruled by his status in reference to the property of the firm under his, control in the enemy country.
'The property was,- through his residence in that country, subjected to the power of the enemy, and comes within the category of “ enemies’ property.”
There is more difficulty in reference to the claim of Irvin & Co. to the thirty tierces of tobacco strips.
It very clearly appears-that Irvin & Co., claimants, purchased .this tobacco before the war broke out, with their own means,
' which were then in Riohmond, and that they are citizens and residents of New York.
It is claimed that the property should be condemned on the ground that the transaction constitutes an illegal traffic with the' enemy. This certainly cannot be held to apply to the purchase of the tobacco, which was bought and paid for before hostilities commenced. If it is intended to apply the principle of illegal traffic to the attempt to withdraw the property from the enemy country, it would seem that the order of the Secretary of the Navy allowing fifteen days for all vessels to withdraw from the blockaded ports, with or without cargo, should be held to apply to the property of one of our own citizens, residing in New York, already bought and paid for, as well -as to any neutral cargo. If this be correct, it would seem that the property of Irvin & Co. should be restored to them as that of Laurie, Son & Co. was.
The right of Scott & Clarke to commissions on profits :really ■ constituted no interest in the property, and presents no cogni zahle feature in the case.
This property will therefore be restored to the claimants.