CASE 9—PETITION ORDINARY—JUNE 7.

# L. Berry et al. vs. Southern Bank of Kentucky.

# U. G. Berry vs. same.

APPEAL FROM LIVINGSTON CIRCUIT COURT.

B. drew bills at Smithland, Kentucky, on G. W. & Co., of New Orleans, La., on the 30th April, 1861, payable 2d September, 1861, at the latter city. *Held*—That the civil war which intervened rendered presentment for protest or payment unnecessary, and the drawers were liable, although no protest had been had or notice of non-acceptance or non-payment given. (*Wheaton's International Law,* 544, 548, 556; 8 *Cranch,* 155; *Story on Bills, sec.* 308, *p.* 347; *sec.* 365, *p.* 427.)

HARLAN & HARLAN, for appellants, cited *Civ. Code, secs.* 651; *Edwards on Bills,* 696.

W. D. GREER, on same side, cited *Civil Code, secs.* 65, 135, 221; *Smith's Merc. Law, p.* 333 *to* 336; *Story on Bills, secs.* 447, 448, *and notes;* 1 *Kent, secs.* 3 *and* 4; 4 *Dana,* 314; 3 *B.Mon.,* 513.

A. DUVALL, for appellee, cited 4 *Met.,* 342; *Civ. Code, secs.* 649 *to* 654.

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

L. Berry and his indorsers made a bill of exchange for $1,930 80, dated April 30th, 1861, addressed to Given, Watts & Co., New Orleans, La., payable September 2d, 1861.

U. G. Berry made one for $612 52 of same date, payable at same time and place.

Both of these bills were sold to the Smithland Branch of the Southern Bank of Kentucky, and were made in Kentucky; hence must be regarded as foreign bills of exchange.

It is averred by plaintiff that the bills were duly protested for non-payment, and that the defendants have had due notice; that on account of the civil war then raging, and all mail communications being cut off between New Orleans and Smithland, that they have not received the bills or protests, &c.; and finally, that the same has been lost, &c.

The defendants deny all these material allegations, and both parties presented proof.

The court adjudged that the defendants had not paid the bills, and that plaintiff had used due and legal diligence, and, therefore, gave it judgment on each bill. These appeals seek a reversal.

The President of the United States, April 27th and 30th, 1861, declared and proclaimed a blockade of certain ports of the Southern States, then in a state of insurrection—Louisiana being one of those States, and New Orleans being one of the ports.

The supreme court of the United States, in the "Prize Cases" (2 *Black*, 670), held that "the proclamation of blockade is itself official and conclusive evidence to the court that a state of war existed."

By authority of the act of Congress, approved July 13th, 1861, the President of the United States, by proclamation of August 16th, 1861, prohibited all commercial intercourse with the people of all the insurgent States on the part of the people of the loyal States, Louisiana being then an insurgent State; consequently, not only all mail facilities were cut off, but all commercial intercourse of every kind and character between the citizens of the insurgent and loyal States was prohibited,

strict non-intercourse declared, and all commercial transactions, not specially authorized by license from the government, became illegal.

The presentation of these bills for acceptance or payment to Messrs. Given, Watts & Co., New Orleans, after said proclamation of non-intercourse, was not only unnecessary, but prohibited by law.

As these bills were drawn by citizens of Kentucky, and were held by one of its banks, and the people of Kentucky being at war with the people of Louisiana, the collection of these bills in New Orleans would have given the enemy power over the funds not only to tax for the support of the rebellion, but would have enabled the hostile government to sequestrate the same; hence, its collection there from an enemy-citizen was alike a violation of the rights of the United States government, whether tested by the rules of international law or the provisions of its own positive statutes.

" One of the immediate consequences of the commencement of hostilities, is the interdiction of all commercial intercourse between the subjects of the States at war, without the license of their respective governments." (*Law. Wheaton on Internat. Law*, 544.)

"The object, policy, and spirit of the rule are intended to cut off all *communication*, or *actual locomotive* intercourse, between individuals of the States at war." (*Same*, 548; *and* 8 *Cranch, S. P. C. U. S. Rep.*, 155, *The Rapid*.)

" It follows, as a corollary from the principle interdicting all commercial and other pacific intercourse with the public enemy, that every species of private contract made with his subjects during the war is unlawful. The rule thus deduced is applicable to the drawing and negotiating of bills of exchange between subjects of the powers at war; to the remission of funds, in money or bills, to the enemy's country. (*Law. Wheaton on Internat. Law*, 556.)

It is also said in Story on Bills (*sec*. 308, *p*. 347): " It will be a sufficient excuse for omitting to give notice to a party, that there is a physical or moral impossibility of so doing;" and among these impossibilities he enumerates " war or other

political events, or other circumstances interrupting the intercourse between different countries."

Again, at section 365, page 427, Mr. Story says: "If a due presentment for payment be prevented by inevitable accident or casualty, or by war breaking out between the country of the holder and that of the acceptor, or by an occupation of the country by an enemy, or by political events which obstruct or prohibit the presentment; in all these, and the like cases, the want of presentment will be excused."

This doctrine is very fully affirmed by Chitty and other eminent jurists.

Indeed, it might be well questioned whether there was any officer then in Louisiana by whom the bill could legally be protested; for, as the United States government regarded them as insurgents, were prosecuting a war against them as such, perhaps it would be incompatible to recognize any official act of her officers as legitimate; but be this as it may, presentment both for acceptance and payment were wholly excused by the political disturbances and state of civil war. As protest was unnecessary, so notice thereof became immaterial. Payment at New Orleans would have been illegal, consequently, it would seem that the situation of the country being public and notorious, would be sufficient notice to every party to the bill.

The averments of the petition as to the presentment and dishonor of the bill were wholly unnecessary, save so far as to explain its loss. The loss of the bills being sufficiently shown, and legal excuse for non-presentment and notice being made out, and section 6, Civil Code, fully authorizing suit by ordinary proceedings "upon a written obligation which has been lost or destroyed," we see no reason for reversing either judgment.