### WEISSMAN v. METROPOLITAN LIFE INS. CO.
### No. 14670.

United States District Court
S. D. California, C. D.
May 20, 1953.

Louis R. Stein, Los Angeles, Cal., for plaintiff.

Adams, Duque & Hazeltine, Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

On December 6, 1943, Stanley J. Weissman (then age 14 years) as applicant and insured, and his father, Jack Weissman, plaintiff herein, as owner, entered into a contract of insurance with the defendant Metropolitan Life Insurance Company. The contract provided (among other things) for payment to Jack Weissman of the sum of $5,000 in the event of the death of his son. It provided further for additional payment of $5,000 if the insured died as the result of bodily injuries caused solely by external, violent and accidental means, except while the insured was "in the military, naval or air forces of any country at war."

Stanley J. Weissman was inducted into the military service of the United States of America on January 17, 1951, and was killed by enemy small arms fire at Mandae-ri, Korea, on August 31, 1951, while he and his company were attacking enemy-held positions.

Notice and proof of death of the insured was subsequently filed with the Metropolitan Life Insurance Company, which paid to decedent's father the face amount of the policy of $5,000, with accrued dividends and premiums. However, the company rejected the father's claim for payment of the additional $5,000 under the accidental means death benefit provision of the policy, upon the ground the insured came within the exception of the policy, inasmuch as he was in the military service of the United States and the United States at the time of the insured's death was "at war." When Metropolitan Life Insurance Company refused to pay the sum alleged to be due under the accidental means death benefit provision of the policy, this action was filed.

The primary issue presented to the court for decision is one of fact which may be stated as follows:

Is the conflict now raging in Korea a "war" within the meaning of the insurance policy?

The noun "war" is one of those words in the English language which, tho' everyone understands the meaning thereof, few can definitely define. It is probable that when the contract in question was executed there was no discussion between the parties as to the meaning of the term "country at war." At that time the insured was a boy of only fourteen years, and there was possibly no thought in the minds of the parties that the insured within the course of a few years would be inducted into the armed forces and killed while attacking an enemy. Probably the parties who executed the contract understood so well in their own minds the mean-

ing of the term "war" that there was no necessity for further defining it.

Plaintiff contends the policy in question must be construed in favor of the insured. Where such a contract contains a word or phrase chosen by the insurer which is reasonably open to two constructions the most favorable to the insured will be adopted. Island v. Fireman's Fund Indemnity Co., 30 Cal.2d 541, 184 P.2d 153, 173 A.L.R. 896. Plaintiff further contends the insurance company in using the word "war" intended its use in the strict, legal sense. Rosenau v. Idaho Mutual Benefit Ass'n, 65 Idaho 408, 145 P.2d 227. Plaintiff cites many cases, mostly from state courts, which hold that insurance companies in using the term "war" employed it in its constitutional or legal sense. The latest dissertation upon this problem comes from Pennsylvania in the cases of Harding v. Pennsylvania Mutual Life Ins. Co., 171 Pa.Super. 236, 90 A.2d 589; 1 Life Cases 2d 51, and Beley v. Pennsylvania Mutual Life Ins. Co., 171 Pa.Super. 253, 90 A.2d 597; 1 Life Cases 2d 38.

Ever since the adoption of the Constitution there has been controversy as to the meaning of the term "war." The Constitution provides war may be declared only by the Congress; and it is argued there can be no war of which the court may take judicial notice until there has been some act or declaration creating or recognizing its existence by that department of the government clothed with war-making power. Plaintiff in the case at bar urges that inasmuch as there has been no formal declaration of war, the conflict in Korea is not a war in the strict, legal sense of the word.

■ Although this nation has been recognized as a peace-loving nation, history indicates there have been very few years of our existence as a nation in which the country has not been engaged in warfare of one kind or another. It is true that on many occasions the conflict was not designated as war by that section of government empowered with the declaration of war, but nevertheless there have been innumerable conflicts in which a great number of troops have been utilized, large expenditures made for munitions, and many casualties suffered. But to those who would hold to the strict interpretation of the term "war" there can be no war without a formal declaration.

■ This matter has often received the attention of our courts, and the United States Supreme Court has been asked often to pass upon the question of whether the United States was engaged in war, although there had been no formal declaration thereof. One of the earlier decisions handed down by the Supreme Court is that contained in the Prize Cases (The Amy Warwick), 1862, 2 Black. 635, 67 U.S. 635, 17 L.Ed. 459, wherein Mr. Justice Grier discussed the question whether, in 1861, the United States, prior to a declaration, was engaged in war with the Southern States. Justice Grier calls attention that "By the Constitution, Congress has the power to declare a national or foreign war." And, referring to the development of the Civil War, he says, 67 U.S. at page 669:

"* * * However long may have been its previous conception, it nevertheless sprung forth suddenly from the parent brain, a Minerva in the full panoply of war. The President was bound to meet it in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact."

And discussing the Civil War further, he says:

"* * * They cannot ask a Court to affect a technical ignorance of the existence of a war, which all the world acknowledges to be the greatest civil war known in the history of the human race, * * *

*     *     *     *     *     *

"If it were necessary to the technical existence of a war, that it should have a legislative sanction, we find it in almost every act passed at the extraordinary session of the Legislature of 1861, which was wholly employed in enacting laws to enable the Government to prosecute the war with vigor and efficiency * * *

"Without admitting that such an act was necessary under the circumstances, it is plain that if the President had in any manner assumed powers which it was necessary should have the authority or sanction of Congress, that on the well known principle of law, 'omnis ratihabitio retrotrahitur et mandato equiparatur,' this ratification has operated to perfectly cure the defect."

In the case at bar (without admitting it was necessary under the circumstances for Congress to baptize the Korean conflict by giving it the name of "war") it is plain there certainly has been legislative sanction thereof. Because Congress has seen fit to provide money necessary to carry on the conflict, furnish arms, munitions, ships and troops and to proceed in the same manner as if there had been a formal declaration of war, under the authority of the Prize Cases, supra, this court certainly is justified in finding that if such a declaration were necessary, nonetheless, the conflict has received the sanction of Congress.

The federal courts have been consistent in following the rule as laid down in the Prize Cases. In Hamilton v. McClaughry, C.C., 136 F. 445, at page 449 the Court said:

" * * * In the present case, at no time was there any formal declaration of war by the political department of this government against either the government of China or the 'Boxer' element of that government. A formal declaration of war, however, is unnecessary to constitute a condition of war. * * *

* * * * * *

" * * * at no time was there any declaration of war on the part of this government against the government of China. Yet I am constrained to hold that by reason of the occupation of Chinese territory by the large military force of this government, under authority of the Department of War, the many conflicts between the forces of this government and the armed Chinese troops, and the recognition of a condition of war by the Congress of the United States in making payment to the officers and men of this government there engaged on a war basis and all the other facts and circumstances in this case, at the time the homicide in question was committed there prevailed in China a condition of war, within the spirit and intent of the fifty-eighth article of war, * * *."

■ In New York Life Ins. Co. v. Durham, 10 Cir., 166 F.2d 874 at page 875, the Court discussed the question whether after surrender of the Germans and Japanese on September 25, 1945, this country was still engaged in war, saying:

" * * * The existence of war and restoration of peace are determined solely by the political departments of our Government, and such determinations are conclusively binding upon the Courts in all matters of state or public concern, and war having been declared, its existence must be recognized by the Courts until peace is proclaimed, although actual warfare may have ceased. [Citing cases.] In deciding judicial questions concerning the commencement or termination of a state of war, the Courts are generally required to refer to some public act of the political departments of the Government. * * *"

And, at page 876 of 166 F.2d speaking of contracts of insurance, the Court went on to say:

" * * * When the contract was viewed in its context and the manifest intent of the parties ascertained, we were of the opinion that they contracted with reference to war in its real and practical sense; that is, its hazards to human life, and that the Courts were not required to 'affect a technical ignorance' of actualities."

The Court, in the foregoing, referred to New York Life Ins. Co. v. Bennion, 158 F.2d 260, at page 261 also a Tenth Circuit case, which discussed the question whether this government was at war with Japan prior to the declaration thereof after the attack on Pearl Harbor, the Court said:

" * * * When the attack was launched, we were not only at peace

with Japan, but were actually engaged in a peace conference with her envoys. * * *"

And on page 262 of 158 F.2d

"* * *, it seems to be agreed that the existence or non-existence of a state of war is a political question, to be determined by the political department of our Government. The basic difference lies in the contention on the one hand that a formal declaration by the Congress, which alone has the constitutional power to declare and make war, is an essential prerequisite to judicial cognizance of its existence; and the contention on the other hand that the existence of a war is not dependent upon its formal declaration, but rather is determinable from an appraisal of actualities; * * *. Both contentions find very respectable support in the adjudicated cases."

The Court says further, at page 264 of 158 F.2d:

"* * * we therefore conclude that the formal declaration by the Congress on December 8th was not an essential prerequisite to a political determination of the existence of a state of war commencing with the attack on Pearl Harbor."

■ The Supreme Court has also had occasion to pass upon the question whether, in insurance policies, words which are used by the insurance company shall be interpreted in the strict, legal sense or considered in their ordinary meaning. In the case at bar plaintiff alleges that since the defendant insurance company used the term "war" in its policy it was employing the term in its strict, legal sense; that is, in the sense that there was no war in the absence of an official declaration thereof. Unfortunately for plaintiff, this contention has been overruled by the Supreme Court of the United States.

In Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137, which went to the Supreme Court on certiorari from the Ninth Circuit, 65 F.2d 976, the court considered the double indemnity provision of an insurance policy. At the trial liability was conceded for the single amount stipulated to be paid in the event of the insured's death by accident (as in the case at bar), but double indemnity was contested on the ground the insured was not a passenger on a common carrier within the meaning of the double indemnity clause of the policy. (This is exactly the position taken by the defendant herein.) The trial court was reversed by the Circuit Court of Appeals which directed that the judgment be reduced by one-half. On certiorari the Supreme Court reversed the Circuit Court of Appeals and said, 294 U.S. at page 84, 54 S. Ct. at page 593:

"* * * we are interpreting a contract and are concerned only with the sense in which its words were used. [Citations.] The phraseology of contracts of insurance is that chosen by the insurer and the contract in fixed form is tendered to the prospective policyholder who is often without technical training, and who rarely accepts it with a lawyer at his elbow. So if its language is reasonably open to two constructions, that more favorable to the insured will be adopted, [citations]; and unless it is obvious that the words are intended to be used in their technical connotation they will be given the meaning that common speech imports. [Citing cases.]

"We think the word 'passenger' cannot be restricted to the technical meaning which may be assigned to it by the law of common carriers, for it also has a common or popular meaning which would at least include the insured who, with a ticket in his possession, was riding on the steps of the train."

■ Regarding the interpretation of a contract, in New York Life Ins. Co. v. Bennion, supra, the Court said:

"* * * In construing and interpreting the contract between the parties, it is our function and duty to ascertain and effectuate their lawful intention. In so doing, we should place ourselves in the position of the parties when the contract was made, con-

sider the purposes, the subject matter, and the circumstances under which their minds met. [Citing cases.]

\* \* \* \* \* \*

"But we can find nothing in the subject matter, the context, or the purpose of this contract to indicate that the parties intended to use the word war in the technical sense of a formally declared war. The parties did not specify any particular type or kind of war, rather they used the all inclusive term, and we think it only fair to assume that they had in mind any type or kind of war in which the hazard of human life was involved."

The United States Court of Appeals for the District of Columbia, in Stinson v. New York Life Ins. Co., 83 U.S.App.D.C. 115, 167 F.2d 233, at page 235, said:

"We face the necessity of interpreting a contract. Our sole duty is to find out what was intended by the parties according to the expressed or apparent intent manifested by the language employed, and give effect to that intention if it can be done consistently with legal principles. \* \* \*

\* \* \* \* \* \*

"In the light of the many adjudications subsequent to World War I, wherein it was held that ambiguous exemption clauses will be resolved in favor of the insured, that 'engaged' and 'war' are words which have been held to import various meanings, and that interpretation of such words will rest in common understanding in the absence of indicia that technical meaning was attached, \* \* \*."

From the authorities cited above we must come to the conclusion that there may be war (within the meaning of that term employed in an insurance policy) without an official declaration thereof, and that unless it is indicated in the contract that the term "war" is to be used in its strict, legal sense the parties have a right to assume it is to be given its common understanding or meaning.

We doubt very much if there is any question in the minds of the majority of the people of this country that the conflict now raging in Korea can be anything but war. Certainly those who have been called upon to suffer injury and maiming, or to sacrifice their lives, would be unanimous in their opinion that this is war—war in all of its horrible aspects. And the families deprived of the love and companionship of their sons, brothers, husbands and fathers—who meet each day with hope and fear for their boys and men in Korea—and the widows and orphans of the men who died there—certainly they are aware of the stark reality that the Korea conflict is war. .

It is the decision of this court that the insured in the case at bar died in the military service of the United States of America at a time when the United States was at war. Judgment is rendered in favor of the defendant.

Defendant is directed to prepare Findings of Fact, Conclusions of Law and Judgment in conformity herewith for presentation to the court on or before June 5, 1953.