## Reëmployment Rights of Korean War Veterans

ADAMS, Deputy Attorney General, April 9, 1954.—
This department is in receipt of your request for advice, under date of March 22, 1954, as to whether under the Act of June 7, 1917, P. L. 600, a civil service employe of the board, who was also a member of the United States Naval Reserve, and who was ordered to active duty on May 21, 1952, and served in such Naval service until March 10, 1954, is entitled to be reinstated to his former position with the Liquor Control Board.

Section 1 of the Act of June 7, 1917, P. L. 600, 65 PS §111, provides as follows:

". . . whenever any appointive officer or employe, regularly employed by the Commonwealth of Pennsylvania in its civil service, or by any department, bureau, commission, or office thereof, or by any county, municipality, township, or school district within the Commonwealth, *shall in time of war or contemplated war enlist*, enroll, or be drafted in the military or naval service of the United States, or any branch or unit thereof, he shall not be deemed or held to have thereby resigned from or abandoned his said office or

employment, nor shall he be removable therefrom during the period of his service, but the duties of his said office or employment shall, if there is no other person authorized by law to perform the powers and duties of such officer or employe during said period, be performed by a substitute, who shall be appointed by the same authority who appointed such officer or employe, if such authority shall deem the employment of such substitute necessary. Such substitute shall receive so much of the salary or wages attached to said office or employment as shall not be paid to the dependent or dependents of said officer or employe, as hereinafter provided, and such substitute may receive such further compensation, from appropriations made for that purpose or otherwise, as may be required, when added to the amount received under the provisions of this act, to constitute a reasonable compensation for his services, in the opinion of the authority appointing him." (Italics supplied.)

In view of the phrase "shall in time of war or contemplated war" the following facts must be given consideration.

The state of war between the United States and Germany was terminated by a proclamation of the President on October 9, 1951, on which date a joint resolution of Congress was also passed declaring the war terminated. A treaty of peace was signed with Japan September 8, 1951, and ratified by the United States Senate on March 20, 1952. The said treaty came into force on April 28, 1952.

Since the civil service employe was called to active duty on May 21, 1952, the question arises as to whether or not he was called into service "in time of war or contemplated war". This resolves itself into the question as to whether or not the conflict in Korea was a war, within the meaning of that term as used in the Act of 1917, supra.

In the case of Beley v. Pennsylvania Mutual Life Insurance Company, 373 Pa. 231 (1953), the Supreme Court of Pennsylvania had before it the following question: "Is the present struggle in Korea a 'war' within the meaning of that term as employed in a certain life insurance policy?"

The court said:

"Andrew Beley, serving with a United States Army Infantry division in the conflict in Korea, was killed in action on March 7, 1951, while serving with the United States contingent of the United Nations forces. On May 1, 1945, Pennsylvania Mutual Life Insurance Company, defendant, had issued a policy on his life in favor of his mother, Julia Beley, the present plaintiff. The policy was in the amount of $1,000 with a supplementary contract attached which provided for double indemnity in case of external, violent and accidental death. One of the provisions of the policy was that 'In the event that the Insured engages in military or naval service in the time of war, the liability of the Company shall be limited to the return of the premiums paid hereunder, unless the Insured shall have previously secured from the Company a permit to engage in such service.' (Admittedly, no such permit had been secured.)

"In connection with the additional accidental death benefit there were provisions as follows: 'Risks Not Assumed:—The Company shall not be liable for the additional Accidental Death Benefit specified above if said death shall result by reason of any of the following: . . . (d) Military, air or naval service in time of war. (e) Any work in connection with actual warfare, riot, insurrection, police duties or any act incidental thereto, either on land or water. . . .'

" 'Termination:—These provisions for the additional Accidental Death Benefit shall immediately terminate: . . . (b) if the Insured shall at any time,

voluntarily or involuntarily, engage in military, air or naval service in time of war; . . .'

"The Company refused payment of the face amount of the policy on the ground that the insured was engaged in military service 'in the time of war' and refused payment of the accidental death benefit on the additional ground that the death of the insured had resulted by reason of such service. In our opinion, the Superior Court properly entered judgment for plaintiff for the whole amount of her claim. . . .

"Although Congress has, in certain enactments, recognized that military forces of the United States are operating in Korea and has appropriated funds for the support of the armed forces there, it is obvious from the above recital of events that there was not, nor ever has been, any declaration of war by Congress against any other country, state or nation, but merely a dispatch to Korea by Presidential order of military, naval and air forces of the United States in accordance with the provisions of the Charter of the United Nations and the recommendations of the Security Council. Since, therefore, it is Congress that has the power under the Constitution to declare war, and since that power is exclusive (*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579, 642), it is clear that the action being waged in Korea is not a 'war' within what may be termed the 'constitutional' or 'legal' sense of that term. Defendant urges, however, that it is in *fact* a war, because what started apparently as a minor 'police action' has developed, by reason of its duration, its bitterness, and the number of its casualties, into a sanguinary struggle of grave proportions, and urges further that the connotation of the word 'war' in the Company's insurance policies should not be limited to a formally declared war, but embraces any clash of arms in which the methods of war are pursued, and especially where the conflict is, as in Korea, of such

extensive dimensions. The trouble with this argument is that if the word 'war' in such policies were to be interpreted as other than one declared by Congress, courts would be utterly at sea whenever the question arose as to whether certain expeditions in which United States forces were engaged constituted a war. . . .

". . . A policy of life insurance is a highly technical instrument, drawn up presumably with meticulous care by legal experts on behalf of the Insurance Company, and who not only intend to use all terms in their legal sense but know how to accomplish that result; it may be assumed, therefore, that if defendant had here meant to invest the term 'war' with a broader connotation than its 'constitutional' or 'legal' intendment, it would have effected this by the addition of words indicating such an intention as, for example, 'declared or undeclared' war.

"The existence or non-existence of a state of war is a political, not a judicial, question, and it is only if and when a formal declaration of war has been made by the political department of the government that judicial cognizance may be taken thereof; when so made it becomes binding upon the judiciary: *Bishop v. Jones & Petty*, 28 Texas 294, 319, 320; *Perkins v. Rogers*, 35 Indiana 124, 167; *Hamilton v. M'Claughry*, 136 Fed. 445, 449; *Verano v. DeAngelis Coal Co.*, 41 F. Supp. 954. An exact question involving the application of this principle arose in connection with the Japanese surprise attack on Pearl Harbor on December 7, 1941, war with Japan not being officially declared by Congress until the day following, December 8. As we all know, an appalling number of lives were lost in that infamous attack, and yet, in a majority of the cases involving the interpretation of the word 'war' as employed in life insurance policies similar to the one here in question, it was held that war did not exist on December 7, and therefore the bene-

ficiaries of such policies were entitled to recover: *West v. Palmetto State Life Insurance Co.*, 202 S. C. 422 (25 S. E. 2d 475); *Rosenau v. Idaho Mutual Benefit Association*, 65 Idaho 408, 145 P. 2d 227; *Savage v. Sun Life Assur. Co. of Canada*, 57 F. Supp. 620; *Pang v. Sun Life Assur. Co. of Canada*, 14 C. C. H. Life Cases 496 (37 Hawaiian Rep. 208)."

In the case of Weissman v. Metropolitan Life Insurance Company, 112 F. Supp. 420 (1953) the court held that within the strict interpretation of the word "war" there can be no war without formal declaration and the existence of war is determined solely by political departments of government, and such determination is conclusively binding on courts in all matters of State or public concern. The court, however, went on to say that if language on the insurance policy is reasonably open to two constructions, that more favorable to the insured will be adopted.

At page 425 the court said:

"From the authorities cited above we must come to the conclusion that there may be war (within the meaning of that term employed in an insurance policy) without an official declaration thereof, and that unless it is indicated in the contracts that the term 'war' is to be used in its strict, legal sense the parties have a right to assume it is to be given its common understanding or meaning.

"We doubt very much if there is any question in the minds of the majority of the people of this country that the conflict now raging in Korea can be anything but war. Certainly those who have been called upon to suffer injury and maiming, or to sacrifice their lives, would be unanimous in their opinion that this is war—war in all of its horrible aspects. And the families deprived of the love and companionship of their sons, brothers, husbands and fathers—who meet

each day with hope and fear for their boys and men in Korea—and the widows and orphans of the men who died there—certainly they are aware of the stark reality that the Korea conflict is war.

"It is the decision of this court that the insured in the case at bar died in the military service of the United States of America at a time when the United States was at war. Judgment is rendered in favor of the defendant."

In the case of Western Reserve Life Insurance Co. v. Meadows, 261 S. W. 2d 554 (1953) (Texas), which was a suit to recover under double indemnity provision of a life policy for death of an Army officer as a result of a crash of a military airplane in which he was a passenger, while traveling under military orders, the court, at page 560, said:

"In summary: It is, as has been said, the settled law in this state that, unless a contrary intention is shown by the contract, the terms used in policies of insurance are to be given their plain, ordinary and generally accepted meaning. It is clear that nothing in the contract of insurance involved herein suggests that the word 'war' is used in its 'technical' or 'legal' sense. It is clear that the plain, ordinary and generally accepted meaning of the word 'war' is war in fact. It is clear that there was war in fact in Korea when the insured was killed and that he was killed 'in time of war.' It follows that there can be no recovery under the accidental death provisions of the policies."

In the case of Stanberry v. Aetna Life Insurance Company, 26 N. J. Super. 498, 98 A. 2d 134 (1953), which involved an action by a beneficiary to recover double indemnity benefits under policy of life insurance the court held that the accidental death of a United States Army captain from a mine explosion while he was on reconnaissance for a company camp site in

Korea, resulted from military service in time of war within meaning of life policy double indemnity exclusionary clause to effect that double indemnity was payable if accidental death does not result from military or naval service in time of war.

"The conflict still raging in Korea is a war in the ordinary and usual meaning of the word, and it was such on March 27, 1952, when the insured met his untimely death. See Weissman v. Metropolitan Life Insurance Co., 112 F. Supp. 420 (D. C. S. D. Cal. 1953). To hold otherwise and rule the Korean war is not a war seems to me inexplainable and absurd. . . ."

From the above it is obvious that the appellate courts of different States have made contrary findings and rulings with regard to whether or not the Korean conflict is a war insofar as the interpretation of clauses in insurance policies is concerned. Turning, however, to the opinion of our own Supreme Court in the case of Beley v. Pennsylvania Mutual Life Insurance Company, supra, a careful reading of the opinion suggests that the court went to great lengths to point out that it was interpreting a life insurance contract drawn by legal experts with meticulous care on behalf of the insurance company.

The Supreme Court made it clear that its opinion was based on a "constitutional" or "legal" definition of the word "war" which strict interpretation was necessitated by the rule that an instrument must be construed strictly as to the party drafting it (here the insurance company) and liberally as to the other party (the insured). This same consideration is not applicable to the use of the word "war" in a statute conferring benefits on veterans. The word in its general sense should be used and so liberally interpreted in the veteran's favor.

As a result of the study of this opinion, we are convinced that the interpretation placed upon the word

"war" and the significance given to the Korean conflict in a contract of insurance should not be used as a guide when we interpret the word "war" as used in a statute passed by the General Assembly for the benefit of veterans.

We conclude that the word "war" in such statute is not used in its technical and legal sense and the statute was not drawn with the idea of protecting the rights of anyone other than the rights of a Commonwealth employe who leaves his employment either voluntarily or involuntarily to answer the call of his country. It has always been the policy of the Commonwealth of Pennsylvania to treat veterans with special consideration.

Attention is also directed to our discussion of the phrase "contemplated war" in formal opinion no. 377, dated December 9, 1940, 1939-1940 Op. Atty. Gen. 486, directed to all departments, boards and commissions. We believe this supports our view that the phrase "time of war or contemplated war" is to be used in its popular sense rather than in its technical or legalistic meaning.

Section 33 of the Act of May 28, 1937, P. L. 1019, 46 PS §533, known as the Statutory Construction Act, reads:

"Words and phrases shall be construed according to rules of grammar and according to their common and approved usage. . . ."

In Commonwealth v. Bay State Milling Co., 312 Pa. 28 (1933), it was said "Statutes are presumed to employ words in their popular sense . . .". We do not think "war" is a technical word nor has it acquired a peculiar meaning. We hear much today of the "cold war" or "war of nerves".

We, therefore, conclude that the word "war" in the statute is used in its common or ordinary sense and that those who participated in the Korean conflict were

engaged in the armed services during "time of war or contemplated war" as that term is used in the statute under consideration and the former civil service employe discharged from military service on March 10, 1954, is entitled to reinstatement in his former position with the Liquor Control Board.