74 U.S. 700 (____)
7 Wall. 700
TEXAS
v.
WHITE ET AL.
Supreme Court of United States.

*717 The case was argued by Messrs. Paschal and Merrick, in behalf of Texas; and contra, by Mr. Phillips, for White; Mr. Pike, for Chiles; Mr. Carlisle, for Hardenberg; and Mr. Moore, for Birch, Murray & Co.
The CHIEF JUSTICE delivered the opinion of the court.
This is an original suit in this court, in which the State of Texas, claiming certain bonds of the United States as her property, asks an injunction to restrain the defendants from receiving payment from the National government, and to compel the surrender of the bonds to the State.
It appears from the bill, answers, and proofs, that the United States, by act of September 9, 1850, offered to the State of Texas, in compensation for her claims connected with the settlement of her boundary, $10,000,000 in five per cent. bonds, each for the sum of $1000; and that this offer was accepted by Texas. One-half of these bonds were retained for certain purposes in the National treasury, and the other half were delivered to the State. The bonds thus delivered *718 were dated January 1, 1851, and were all made payable to the State of Texas, or bearer, and redeemable after the 31st day of December, 1864. They were received in behalf of the State by the comptroller of public accounts, under authority of an act of the legislature, which, besides giving that authority, provided that no bond should be available in the hands of any holder until after indorsement by the governor of the State.
After the breaking out of the rebellion, the insurgent legislature of Texas, on the 11th of January, 1862, repealed the act requiring the indorsement of the governor,[*] and on the same day provided for the organization of a military board, composed of the governor, comptroller, and treasurer; and authorized a majority of that board to provide for the defence of the State by means of any bonds in the treasury, upon any account, to the extent of $1,000,000.[] The defence contemplated by the act was to be made against the United States by war. Under this authority the military board entered into an agreement with George W. White and John Chiles, two of the defendants, for the sale to them of one hundred and thirty-five of these bonds, then in the treasury of the State, and seventy-six more, then deposited with Droege & Co., in England; in payment for which they engaged to deliver to the board a large quantity of cotton cards and medicines. This agreement was made on the 12th of January, 1865. On the 12th of March, 1865, White and Chiles received from the military board one hundred and thirty-five of these bonds, none of which were indorsed by any governor of Texas. Afterward, in the course of the years 1865 and 1866, some of the same bonds came into the possession of others of the defendants, by purchase, or as security for advances of money.
Such is a brief outline of the case. It will be necessary hereafter to refer more in detail to some particular circumstances of it.
The first inquiries to which our attention was directed by *719 counsel, arose upon the allegations of the answer of Chiles (1), that no sufficient authority is shown for the prosecution of the suit in the name and on the behalf of the State of Texas; and (2) that the State, having severed her relations with a majority of the States of the Union, and having by her ordinance of secession attempted to throw off her allegiance to the Constitution and government of the United States, has so far changed her status as to be disabled from prosecuting suits in the National courts.
The first of these allegations is disproved by the evidence. A letter of authority, the authenticity of which is not disputed, has been produced, in which J.W. Throckmorton, elected governor under the constitution adopted in 1866, and proceeding under an act of the State legislature relating to these bonds, expressly ratifies and confirms the action of the solicitors who filed the bill, and empowers them to prosecute this suit; and it is further proved by the affidavit of Mr. Paschal, counsel for the complainant, that he was duly appointed by Andrew J. Hamilton, while provisional governor of Texas, to represent the State of Texas in reference to the bonds in controversy, and that his appointment has been renewed by E.M. Pease, the actual governor. If Texas was a State of the Union at the time of these acts, and these persons, or either of them, were competent to represent the State, this proof leaves no doubt upon the question of authority.
The other allegation presents a question of jurisdiction. It is not to be questioned that this court has original jurisdiction of suits by States against citizens of other States, or that the States entitled to invoke this jurisdiction must be States of the Union. But, it is equally clear that no such jurisdiction has been conferred upon this court of suits by any other political communities than such States.
If, therefore, it is true that the State of Texas was not at the time of filing this bill, or is not now, one of the United States, we have no jurisdiction of this suit, and it is our duty to dismiss it.
*720 We are very sensible of the magnitude and importance of this question, of the interest it excites, and of the difficulty, not to say impossibility, of so disposing of it as to satisfy the conflicting judgments of men equally enlightened, equally upright, and equally patriotic. But we meet it in the case, and we must determine it in the exercise of our best judgment, under the guidance of the Constitution alone.
Some not unimportant aid, however, in ascertaining the true sense of the Constitution, may be derived from considering what is the correct idea of a State, apart from any union or confederation with other States. The poverty of language often compels the employment of terms in quite different significations; and of this hardly any example more signal is to be found than in the use of the word we are now considering. It would serve no useful purpose to attempt an enumeration of all the various senses in which it is used. A few only need be noticed.
It describes sometimes a people or community of individuals united more or less closely in political relations, inhabiting temporarily or permanently the same country; often it denotes only the country or territorial region, inhabited by such a community; not unfrequently it is applied to the government under which the people live; at other times it represents the combined idea of people, territory, and government.
It is not difficult to see that in all these senses the primary conception is that of a people or community. The people, in whatever territory dwelling, either temporarily or permanently, and whether organized under a regular government, or united by looser and less definite relations, constitute the state.
This is undoubtedly the fundamental idea upon which the republican institutions of our own country are established. It was stated very clearly by an eminent judge,[*] in one of the earliest cases adjudicated by this court, and we are not aware of anything, in any subsequent decision, of a different tenor.
*721 In the Constitution the term state most frequently expresses the combined idea just noticed, of people, territory, and government. A state, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed. It is the union of such states, under a common constitution, which forms the distinct and greater political unit, which that Constitution designates as the United States, and makes of the people and states which compose it one people and one country.
The use of the word in this sense hardly requires further remark. In the clauses which impose prohibitions upon the States in respect to the making of treaties, emitting of bills of credit, and laying duties of tonnage, and which guarantee to the States representation in the House of Representatives and in the Senate, are found some instances of this use in the Constitution. Others will occur to every mind.
But it is also used in its geographical sense, as in the clauses which require that a representative in Congress shall be an inhabitant of the State in which he shall be chosen, and that the trial of crimes shall be held within the State where committed.
And there are instances in which the principal sense of the word seems to be that primary one to which we have adverted, of a people or political community, as distinguished from a government.
In this latter sense the word seems to be used in the clause which provides that the United States shall guarantee to every State in the Union a republican form of government, and shall protect each of them against invasion.
In this clause a plain distinction is made between a State and the government of a State.
Having thus ascertained the senses in which the word state is employed in the Constitution, we will proceed to consider the proper application of what has been said.
*722 The Republic of Texas was admitted into the Union, as a State, on the 27th of December, 1845. By this act the new State, and the people of the new State, were invested with all the rights, and became subject to all the responsibilities and duties of the original States under the Constitution.
From the date of admission, until 1861, the State was represented in the Congress of the United States by her senators and representatives, and her relations as a member of the Union remained unimpaired. In that year, acting upon the theory that the rights of a State under the Constitution might be renounced, and her obligations thrown off at pleasure, Texas undertook to sever the bond thus formed, and to break up her constitutional relations with the United States.
On the 1st of February,[*] a convention, called without authority, but subsequently sanctioned by the legislature regularly elected, adopted an ordinance to dissolve the union between the State of Texas and the other States under the Constitution of the United States, whereby Texas was declared to be "a separate and sovereign State," and "her people and citizens" to be "absolved from all allegiance to the United States, or the government thereof."
It was ordered by a vote of the convention[] and by an act of the legislature,[] that this ordinance should be submitted to the people, for approval or disapproval, on the 23d of February, 1861.
Without awaiting, however, the decision thus invoked, the convention, on the 4th of February, adopted a resolution designating seven delegates to represent the State in the convention of seceding States at Montgomery, "in order," as the resolution declared, "that the wishes and interests of the people of Texas may be consulted in reference to the constitution and provisional government that may be established by said convention."
Before the passage of this resolution the convention had *723 appointed a committee of public safety, and adopted an ordinance giving authority to that committee to take measures for obtaining possession of the property of the United States in Texas, and for removing the National troops from her limits. The members of the committee, and all officers and agents appointed or employed by it, were sworn to secrecy and to allegiance to the State.[*] Commissioners were at once appointed, with instructions to repair to the headquarters of General Twiggs, then representing the United States in command of the department, and to make the demands necessary for the accomplishment of the purposes of the committee. A military force was organized in support of these demands, and an arrangement was effected with the commanding general, by which the United States troops were engaged to leave the State, and the forts and all the public property, not necessary to the removal of the troops, were surrendered to the commissioners.[]
These transactions took place between the 2d and the 18th of February, and it was under these circumstances that the vote upon the ratification or rejection of the ordinance of secession was taken on the 23d of February. It was ratified by a majority of the voters of the State.
The convention, which had adjourned before the vote was taken, reassembled on the 2d of March, and instructed the delegates already sent to the Congress of the seceding States, to apply for admission into the confederation, and to give the adhesion of Texas to its provisional constitution.
It proceeded, also, to make the changes in the State constitution which this adhesion made necessary. The words "United States," were stricken out wherever they occurred, and the words "Confederate States" substituted; and the members of the legislature, and all officers of the State, were required by the new constitution to take an oath of fidelity to the constitution and laws of the new confederacy.
Before, indeed, these changes in the constitution had been *724 completed, the officers of the State had been required to appear before the committee and take an oath of allegiance to the Confederate States.
The governor and secretary of state, refusing to comply, were summarily ejected from office.
The members of the legislature, which had also adjourned and reassembled on the 18th of March, were more compliant. They took the oath, and proceeded on the 8th of April to provide by law for the choice of electors of president and vice-president of the Confederate States.
The representatives of the State in the Congress of the United States were withdrawn, and as soon as the seceded States became organized under a constitution, Texas sent senators and representatives to the Confederate Congress.
In all respects, so far as the object could be accomplished by ordinances of the convention, by acts of the legislature, and by votes of the citizens, the relations of Texas to the Union were broken up, and new relations to a new government were established for them.
The position thus assumed could only be maintained by arms, and Texas accordingly took part, with the other Confederate States, in the war of the rebellion, which these events made inevitable. During the whole of that war there was no governor, or judge, or any other State officer in Texas, who recognized the National authority. Nor was any officer of the United States permitted to exercise any authority whatever under the National government within the limits of the State, except under the immediate protection of the National military forces.
Did Texas, in consequence of these acts, cease to be a State? Or, if not, did the State cease to be a member of the Union?
It is needless to discuss, at length, the question whether the right of a State to withdraw from the Union for any cause, regarded by herself as sufficient, is consistent with the Constitution of the United States.
The Union of the States never was a purely artificial and *725 arbitrary relation. It began among the Colonies, and grew out of common origin, mutual sympathies, kindred principles, similar interests, and geographical relations. It was confirmed and strengthened by the necessities of war, and received definite form, and character, and sanction from the Articles of Confederation. By these the Union was solemnly declared to "be perpetual." And when these Articles were found to be inadequate to the exigencies of the country, the Constitution was ordained "to form a more perfect Union." It is difficult to convey the idea of indissoluble unity more clearly than by these words. What can be indissoluble if a perpetual Union, made more perfect, is not?
But the perpetuity and indissolubility of the Union, by no means implies the loss of distinct and individual existence, or of the right of self-government by the States. Under the Articles of Confederation each State retained its sovereignty, freedom, and independence, and every power, jurisdiction, and right not expressly delegated to the United States. Under the Constitution, though the powers of the States were much restricted, still, all powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people. And we have already had occasion to remark at this term, that "the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence," and that "without the States in union, there could be no such political body as the United States."[*] Not only, therefore, can there be no loss of separate and independent autonomy to the States, through their union under the Constitution, but it may be not unreasonably said that the preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States.
*726 When, therefore, Texas became one of the United States, she entered into an indissoluble relation. All the obligations of perpetual union, and all the guaranties of republican government in the Union, attached at once to the State. The act which consummated her admission into the Union was something more than a compact; it was the incorporation of a new member into the political body. And it was final. The union between Texas and the other States was as complete, as perpetual, and as indissoluble as the union between the original States. There was no place for reconsideration, or revocation, except through revolution, or through consent of the States.
Considered therefore as transactions under the Constitution, the ordinance of secession, adopted by the convention and ratified by a majority of the citizens of Texas, and all the acts of her legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The obligations of the State, as a member of the Union, and of every citizen of the State, as a citizen of the United States, remained perfect and unimpaired. It certainly follows that the State did not cease to be a State, nor her citizens to be citizens of the Union. If this were otherwise, the State must have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for conquest and subjugation.
Our conclusion therefore is, that Texas continued to be a State, and a State of the Union, notwithstanding the transactions to which we have referred. And this conclusion, in our judgment, is not in conflict with any act or declaration of any department of the National government, but entirely in accordance with the whole series of such acts and declarations since the first outbreak of the rebellion.
But in order to the exercise, by a State, of the right to sue in this court, there needs to be a State government, competent to represent the State in its relations with the National *727 government, so far at least as the institution and prosecution of a suit is concerned.
And it is by no means a logical conclusion, from the premises which we have endeavored to establish, that the governmental relations of Texas to the Union remained unaltered. Obligations often remain unimpaired, while relations are greatly changed. The obligations of allegiance to the State, and of obedience to her laws, subject to the Constitution of the United States, are binding upon all citizens, whether faithful or unfaithful to them; but the relations which subsist while these obligations are performed, are essentially different from those which arise when they are disregarded and set at nought. And the same must necessarily be true of the obligations and relations of States and citizens to the Union. No one has been bold enough to contend that, while Texas was controlled by a government hostile to the United States, and in affiliation with a hostile confederation, waging war upon the United States, senators chosen by her legislature, or representatives elected by her citizens, were entitled to seats in Congress; or that any suit, instituted in her name, could be entertained in this court. All admit that, during this condition of civil war, the rights of the State as a member, and of her people as citizens of the Union, were suspended. The government and the citizens of the State, refusing to recognize their constitutional obligations, assumed the character of enemies, and incurred the consequences of rebellion.
These new relations imposed new duties upon the United States. The first was that of suppressing the rebellion. The next was that of re-establishing the broken relations of the State with the Union. The first of these duties having been performed, the next necessarily engaged the attention of the National government.
The authority for the performance of the first had been found in the power to suppress insurrection and carry on war; for the performance of the second, authority was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government. *728 The latter, indeed, in the case of a rebellion which involves the government of a State, and for the time excludes the National authority from its limits, seems to be a necessary complement to the former.
Of this, the case of Texas furnishes a striking illustration. When the war closed there was no government in the State except that which had been organized for the purpose of waging war against the United States. That government immediately disappeared. The chief functionaries left the State. Many of the subordinate officials followed their example. Legal responsibilities were annulled or greatly impaired. It was inevitable that great confusion should prevail. If order was maintained, it was where the good sense and virtue of the citizens gave support to local acting magistrates, or supplied more directly the needful restraints.
A great social change increased the difficulty of the situation. Slaves, in the insurgent States, with certain local exceptions, had been declared free by the Proclamation of Emancipation; and whatever questions might be made as to the effect of that act, under the Constitution, it was clear from the beginning, that its practical operation, in connection with legislative acts of like tendency, must be complete enfranchisement. Wherever the National forces obtained control, the slaves became freemen. Support to the acts of Congress and the proclamation of the President, concerning slaves, was made a condition of amnesty[*] by President Lincoln, in December, 1863, and by President Johnson in May, 1865.[] And emancipation was confirmed, rather than ordained, in the insurgent States, by the amendment to the Constitution prohibiting slavery throughout the Union, which was proposed by Congress in February, 1865, and ratified, before the close of the following autumn, by the requisite three-fourths of the States.[]
The new freemen necessarily became part of the people, and the people still constituted the State; for States, like individuals, retain their identity, though changed to some *729 extent in their constituent elements. And it was the State, thus constituted, which was now entitled to the benefit of the constitutional guaranty.
There being then no government in Texas in constitutional relations with the Union, it became the duty of the United States to provide for the restoration of such a government. But the restoration of the government which existed before the rebellion, without a new election of officers, was obviously impossible; and before any such election could be properly held, it was necessary that the old constitution should receive such amendments as would conform its provisions to the new conditions created by emancipation, and afford adequate security to the people of the State.
In the exercise of the power conferred by the guaranty clause, as in the exercise of every other constitutional power, a discretion in the choice of means is necessarily allowed. It is essential only that the means must be necessary and proper for carrying into execution the power conferred, through the restoration of the State to its constitutional relations, under a republican form of government, and that no acts be done, and no authority exerted, which is either prohibited or unsanctioned by the Constitution.
It is not important to review, at length, the measures which have been taken, under this power, by the executive and legislative departments of the National government. It is proper, however, to observe that almost immediately after the cessation of organized hostilities, and while the war yet smouldered in Texas, the President of the United States issued his proclamation appointing a provisional governor for the State, and providing for the assembling of a convention, with a view to the re-establishment of a republican government, under an amended constitution, and to the restoration of the State to her proper constitutional relations. A convention was accordingly assembled, the constitution amended, elections held, and a State government, acknowledging its obligations to the Union, established.
Whether the action then taken was, in all respects, warranted by the Constitution, it is not now necessary to determine. *730 The power exercised by the President was supposed, doubtless, to be derived from his constitutional functions, as commander-in-chief; and, so long as the war continued, it cannot be denied that he might institute temporary government within insurgent districts, occupied by the National forces, or take measures, in any State, for the restoration of State government faithful to the Union, employing, however, in such efforts, only such means and agents as were authorized by constitutional laws.
But, the power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress. "Under the fourth article of the Constitution, it rests with Congress to decide what government is the established one in a State. For, as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State, before it can determine whether it is republican or not."
This is the language of the late Chief Justice, speaking for this court, in a case from Rhode Island,[*] arising from the organization of opposing governments in that State. And, we think that the principle sanctioned by it may be applied, with even more propriety, to the case of a State deprived of all rightful government, by revolutionary violence; though necessarily limited to cases where the rightful government is thus subverted, or in imminent danger of being overthrown by an opposing government, set up by force within the State.
The action of the President must, therefore, be considered as provisional, and, in that light, it seems to have been regarded by Congress. It was taken after the term of the 38th Congress had expired. The 39th Congress, which assembled in December, 1865, followed by the 40th Congress, which met in March, 1867, proceeded, after long deliberation, to adopt various measures for reorganization and restoration. These measures were embodied in proposed amendments to the Constitution, and in the acts known as the Reconstruction *731 Acts, which have been so far carried into effect, that a majority of the States which were engaged in the rebellion have been restored to their constitutional relations, under forms of government, adjudged to be republican by Congress, through the admission of their "Senators and Representatives into the councils of the Union."
Nothing in the case before us requires the court to pronounce judgment upon the constitutionality of any particular provision of these acts.
But, it is important to observe that these acts themselves show that the governments, which had been established and had been in actual operation under executive direction, were recognized by Congress as provisional, as existing, and as capable of continuance.
By the act of March 2, 1867,[*] the first of the series, these governments were, indeed, pronounced illegal and were subjected to military control, and were declared to be provisional only; and by the supplementary act of July 19, 1867, the third of the series, it was further declared that it was the true intent and meaning of the act of March 2, that the governments then existing were not legal State governments, and if continued, were to be continued subject to the military commanders of the respective districts and to the paramount authority of Congress. We do not inquire here into the constitutionality of this legislation so far as it relates to military authority, or to the paramount authority of Congress. It suffices to say, that the terms of the acts necessarily imply recognition of actually existing governments; and that in point of fact, the governments thus recognized, in some important respects, still exist.
What has thus been said generally describes, with sufficient accuracy, the situation of Texas. A provisional governor of the State was appointed by the President in 1865; in 1866 a governor was elected by the people under the constitution of that year; at a subsequent date a governor was appointed by the commander of the district. Each of the *732 three exercised executive functions and actually represented the State in the executive department.
In the case before us each has given his sanction to the prosecution of the suit, and we find no difficulty, without investigating the legal title of either to the executive office, in holding that the sanction thus given sufficiently warranted the action of the solicitor and counsel in behalf of the State. The necessary conclusion is that the suit was instituted and is prosecuted by competent authority.
The question of jurisdiction being thus disposed of, we proceed to the consideration of the merits as presented by the pleadings and the evidence.
And the first question to be answered is, whether or not the title of the State to the bonds in controversy was divested by the contract of the military board with White and Chiles?
That the bonds were the property of the State of Texas on the 11th of January, 1862, when the act prohibiting alienation without the indorsement of the governor, was repealed, admits of no question, and is not denied. They came into her possession and ownership through public acts of the general government and of the State, which gave notice to all the world of the transaction consummated by them. And, we think it clear that, if a State, by a public act of her legislature, imposes restrictions upon the alienation of her property, that every person who takes a transfer of such property must be held affected by notice of them. Alienation, in disregard of such restrictions, can convey no title to the alienee.
In this case, however, it is said that the restriction imposed by the act of 1851 was repealed by the act of 1862. And this is true if the act of 1862 can be regarded as valid. But, was it valid?
The legislature of Texas, at the time of the repeal, constituted one of the departments of a State government, established in hostility to the Constitution of the United States. It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful *733 acts. And, yet, it is an historical fact that the government of Texas, then in full control of the State, was its only actual government; and certainly if Texas had been a separate State, and not one of the United States, the new government, having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the words, a de facto government, and its acts, during the period of its existence as such, would be effectual, and, in almost all respects, valid. And, to some extent, this is true of the actual government of Texas, though unlawful and revolutionary, as to the United States.
It is not necessary to attempt any exact definitions, within which the acts of such a State government must be treated as valid, or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual, though unlawful government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void.
What, then, tried by these general tests, was the character of the contract of the military board with White and Chiles?
That board, as we have seen, was organized, not for the defence of the State against a foreign invasion, or for its protection against domestic violence, within the meaning of these words as used in the National Constitution, but for the purpose, under the name of defence, of levying war against the United States. This purpose was, undoubtedly, unlawful, for the acts which it contemplated are, within the express definition of the Constitution, treasonable.
*734 It is true that the military board was subsequently reorganized. It consisted, thereafter, of the governor and two other members, appointed and removable by him; and was, therefore, entirely subordinate to executive control. Its general object remained without change, but its powers were "extended to the control of all public works and supplies, and to the aid of producing within the State, by the importation of articles necessary and proper for such aid."
And it was insisted in argument on behalf of some of the defendants, that the contract with White and Chiles, being for the purchase of cotton-cards and medicines, was not a contract in aid of the rebellion, but for obtaining goods capable of a use entirely legitimate and innocent, and, therefore, that payment for those goods by the transfer of any property of the State was not unlawful. We cannot adopt this view. Without entering, at this time, upon the inquiry whether any contract made by such a board can be sustained, we are obliged to say that the enlarged powers of the board appear to us to have been conferred in furtherance of its main purpose, of war against the United States, and that the contract, under consideration, even if made in the execution of these enlarged powers, was still a contract in aid of the rebellion, and, therefore, void. And we cannot shut our eyes to the evidence which proves that the act of repeal was intended to aid rebellion by facilitating the transfer of these bonds. It was supposed, doubtless, that negotiation of them would be less difficult if they bore upon their face no direct evidence of having come from the possession of any insurgent State government. We can give no effect, therefore, to this repealing act.
It follows that the title of the State was not divested by the act of the insurgent government in entering into this contract.
But it was insisted further, in behalf of those defendants who claim certain of these bonds by purchase, or as collateral security, that however unlawful may have been the means by which White and Chiles obtained possession of the bonds, *735 they are innocent holders, without notice, and entitled to protection as such under the rules which apply to securities which pass by delivery. These rules were fully discussed in Murray v. Lardner.[*] We held in that case that the purchaser of coupon bonds, before due, without notice and in good faith, is unaffected by want of title in the seller, and that the burden of proof in respect to notice and want of good faith, is on the claimant of the bonds as against the purchaser. We are entirely satisfied with this doctrine.
Does the State, then, show affirmatively notice to these defendants of want of title to the bonds in White and Chiles?
It would be difficult to give a negative answer to this question if there were no other proof than the legislative acts of Texas. But there is other evidence which might fairly be held to be sufficient proof of notice, if the rule to which we have adverted could be properly applied to this case.
But these rules have never been applied to matured obligations. Purchasers of notes or bonds past due take nothing but the actual right and title of the vendors.[]
The bonds in question were dated January 1, 1851, and were redeemable after the 31st of December, 1864. In strictness, it is true they were not payable on the day when they became redeemable; but the known usage of the United States to pay all bonds as soon as the right of payment accrues, except where a distinction between redeemability and payability is made by law, and shown on the face of the bonds, requires the application of the rule respecting overdue obligations to bonds of the United States which have become redeemable, and in respect to which no such distinction has been made.
Now, all the bonds in controversy had become redeemable before the date of the contract with White and Chiles; and all bonds of the same issue which have the indorsement of *736 a governor of Texas made before the date of the secession ordinance,  and there were no others indorsed by any governor,  had been paid in coin on presentation at the Treasury Department; while, on the contrary, applications for the payment of bonds, without the required indorsement, and of coupons detached from such bonds, made to that department, had been denied.
As a necessary consequence, the negotiation of these bonds became difficult. They sold much below the rates they would have commanded had the title to them been unquestioned. They were bought in fact, and under the circumstances could only have been bought, upon speculation. The purchasers took the risk of a bad title, hoping, doubtless, that through the action of the National government, or of the government of Texas, it might be converted into a good one.
And it is true that the first provisional governor of Texas encouraged the expectation that these bonds would be ultimately paid to the holders. But he was not authorized to make any engagement in behalf of the State, and in fact made none. It is true, also, that the Treasury Department, influenced perhaps by these representations, departed to some extent from its original rule, and paid bonds held by some of the defendants without the required indorsement. But it is clear that this change in the action of the department could not affect the rights of Texas as a State of the Union, having a government acknowledging her obligations to the National Constitution.
It is impossible, upon this evidence, to hold the defendants protected by absence of notice of the want of title in White and Chiles. As these persons acquired no right to payment of these bonds as against the State, purchasers could acquire none through them.
On the whole case, therefore, our conclusion is that the State of Texas is entitled to the relief sought by her bill, and a decree must be made accordingly.[*]
*737 Mr. Justice GRIER, dissenting.
I regret that I am compelled to dissent from the opinion of the majority of the court on all the points raised and decided in this case.
The first question in order is the jurisdiction of the court to entertain this bill in behalf of the State of Texas.
The original jurisdiction of this court can be invoked only by one of the United States. The Territories have no such right conferred on them by the Constitution, nor have the Indian tribes who are under the protection of the military authorities of the government.
Is Texas one of these United States? Or was she such at the time this bill was filed, or since?
This is to be decided as a political fact, not as a legal fiction. This court is bound to know and notice the public history of the nation.
If I regard the truth of history for the last eight years, I cannot discover the State of Texas as one of these United States. I do not think it necessary to notice any of the very astute arguments which have been advanced by the learned counsel in this case, to find the definition of a State, when we have the subject treated in a clear and common sense manner by Chief Justice Marshall, in the case of Hepburn & Dundass v. Ellxey.[*] As the case is short, I hope to be excused for a full report of it, as stated and decided by the court. He says:
"The question is, whether the plaintiffs, as residents of the District of Columbia, can maintain an action in the Circuit Court of the United States for the District of Virginia. This depends on the act of Congress describing the jurisdiction of that court. The act gives jurisdiction to the Circuit Courts in cases between a citizen of the State in which the suit is brought, and a citizen of another State. To support the jurisdiction in this case, it must appear that Columbia is a State. On the part of the plaintiff, it has been urged that Columbia is a distinct political society, and is, therefore, a `State' according to the *738 definition of writers on general law. This is true; but as the act of Congress obviously uses the word `State' in reference to that term as used in the Constitution, it becomes necessary to inquire whether Columbia is a State in the sense of that instrument. The result of that examination is a conviction that the members of the American Confederacy only are the States contemplated in the Constitution. The House of Representatives is to be composed of members chosen by the people of the several States, and each State shall have at least one representative. `The Senate of the United States shall be composed of two senators from each State.' Each State shall appoint, for the election of the executive, a number of electors equal to its whole number of senators and representatives. These clauses show that the word `State' is used in the Constitution as designating a member of the Union, and excludes from the term the signification attached to it by writers on the law of nations."
Now we have here a clear and well-defined test by which we may arrive at a conclusion with regard to the questions of fact now to be decided.
Is Texas a State, now represented by members chosen by the people of that State and received on the floor of Congress? Has she two senators to represent her as a State in the Senate of the United States? Has her voice been heard in the late election of President? Is she not now held and governed as a conquered province by military force? The act of Congress of March 2d, 1867, declares Texas to be a "rebel State," and provides for its government until a legal and republican State government could be legally established. It constituted Louisiana and Texas the fifth military district, and made it subject, not to the civil authority, but to the "military authorities of the United States."
It is true that no organized rebellion now exists there, and the courts of the United States now exercise jurisdiction over the people of that province. But this is no test of the State's being in the Union; Dacotah is no State, and yet the courts of the United States administer justice there as they do in Texas. The Indian tribes, who are governed by military force, cannot claim to be States of the Union. Wherein does the condition of Texas differ from theirs?
*739 Now, by assuming or admitting as a fact the present status of Texas as a State not in the Union politically, I beg leave to protest against any charge of inconsistency as to judicial opinions heretofore expressed as a member of this court, or silently assented to. I do not consider myself bound to express any opinion judicially as to the constitutional right of Texas to exercise the rights and privileges of a State of this Union, or the power of Congress to govern her as a conquered province, to subject her to military domination, and keep her in pupilage. I can only submit to the fact as decided by the political position of the government; and I am not disposed to join in any essay to prove Texas to be a State of the Union, when Congress have decided that she is not. It is a question of fact, I repeat, and of fact only. Politically, Texas is not a State in this Union. Whether rightfully out of it or not is a question not before the court.
But conceding now the fact to be as judicially assumed by my brethren, the next question is, whether she has a right to repudiate her contracts? Before proceeding to answer this question, we must, notice a fact in this case that was forgotten in the argument. I mean that the United States are no party to this suit, and refusing to pay the bonds because the money paid would be used to advance the interests of the rebellion. It is a matter of utter insignificance to the government of the United States to whom she makes the payment of these bonds. They are payable to the bearer. The government is not bound to inquire into the bonâ fides of the holder, nor whether the State of Taxes has parted with the bonds wisely or foolishly. And although by the Reconstruction Acts she is required to repudiate all debts contracted for the purposes of the rebellion, this does not annual all acts of the State government during the rebellion, or contracts for other purposes, nor authorize the State to repudiate them.
Now, whether we assume the State of Texas to be judicially in the Union (though actually out of it) or not, it will not alter the case. The contest now is between the State of Texas and her own citizens. She seeks to annual a contract *740 with the respondents, based on the allegation that there was no authority in Texas competent to enter into an agreement during the rebellion. Having relied upon one fiction, namely, that she is a State in the Union, she now relies upon a second one, which she wishes this court to adopt, that she was not a State at all during the five years that she was in rebellion. She now sets up the plea of insanity, and asks the court to treat all her acts made during the disease as void.
We have had some very astute logic to prove that judicially she was not a State at all, although governed by her own legislature and executive as "a distinct political body."
The ordinance of secession was adopted by the convention on the 18th of February, 1861; submitted to a vote of the people, and ratified by an overwhelming majority. I admit that this was a very ill-advised measure. Still it was the sovereign act of a sovereign State, and the verdict on the trial of this question, "by battle,"[*] as to her right to secede, has been against her. But that verdict did not settle any question not involved in the case. It did not settle the question of her right to plead insanity and set aside all her contracts, made during the pending of the trial, with her own citizens, for food, clothing, or medicines. The same "organized political body," exercising the sovereign power of the State, which required the indorsement of these bonds by the governor, also passed the laws authorizing the disposal of them without such indorsement. She cannot, like the chameleon, assume the color of the object to which she adheres, and ask this court to involve itself in the contradictory positions, that she is a State in the Union and was never out of it, and yet not a State at all for four years, during which she acted and claims to be "an organized political body," exercising all the powers and functions of an independent sovereign State. Whether a State de facto or de jure, she is estopped from denying her identity in disputes with her own citizens. If they have not fulfilled their *741 contract, she can have her legal remedy for the breach of it in her own courts.
But the case of Hardenberg differs from that of the other defendants. He purchased the bonds in open market, bonâ fide, and for a full consideration. Now, it is to be observed that these bonds are payable to bearer, and that this court is appealed to as a court of equity. The argument to justify a decree in favor of the commonwealth of Texas as against Hardenberg, is simply this: these bonds, though payable to bearer, are redeemable fourteen years from date. The government has exercised her privilege of paying the interest for a term without redeeming the principal, which gives an additional value to the bonds. Ergo, the bonds are dishonored. Ergo, the former owner has a right to resume the possession of them, and reclaim them from a bonâ fide owner by a decree of a court of equity.
This is the legal argument, when put in the form of a logical sorites, by which Texas invokes our aid to assist her in the perpetration of this great wrong.
A court of chancery is said to be a court of conscience; and however astute may be the argument introduced to defend this decree, I can only say that neither my reason nor my conscience can give assent to it.
Mr. Justice SWAYNE:
I concur with my brother Grier as to the incapacity of the State of Texas, in her present condition, to maintain an original suit in this court. The question, in my judgment, is one in relation to which this court is bound by the action of the legislative department of the government.
Upon the merits of the case, I agree with the majority of my brethren.
I am authorized to say that my brother MILLER unites with me in these views.

THE DECREE.
The decree overruled the objection interposed by way of plea, in the answer of defendants to the authority of the solicitors of *742 the complainant to institute this suit, and to the right of Texas, as one of the States of the National Union, to bring a bill in this court.
It declared the contract of 12th January, 1865, between the Military Board and White and Chiles void, and enjoined White and Chiles from asserting any claim under it, and decreed that the complainant was entitled to receive the bonds and coupons mentioned in the contract, as having been transferred or sold to White and Chiles, which, at the several times of service of process, in this suit, were in the possession, or under the control of the defendants respectively, and any proceeds thereof which had come into such possession or control, with notice of the equity of the complainant.
It enjoined White, Chiles. Hardenberg, Birch, Murray, Jr., and other defendants, from setting up any claim to any of the bonds and coupons attached, described in the first article of said contract, and that the complainant was entitled to restitution of such of the bonds and coupons and proceeds as had come into the possession or control of the defendants respectively.
And the court, proceeding to determine for which and how many bonds the defendants respectively were accountable to make restitution of, or make good the proceeds of, decreed that Birch and Murray were so accountable for eight, numbered in a way stated in the decree, with coupons attached; and one Stewart (a defendant mentioned in the note at page 702) accountable for four others, of which the numbers were given, with coupons; decreed that Birch and Murray, as also Stewart, should deliver to the complainant the bonds for which they were thus made accountable, with the coupons, and execute all necessary transfers and instruments, and that payment of those bonds, or any of them, by the Secretary of the Treasury, to the complainant, should be an acquittance of Birch and Murray, and of Stewart, to that extent, and that for such payment this decree should be sufficient warrant to the secretary.
And, it appearing  the decree went on to say  upon the pleadings and proofs, that before the filing of the bill, Birch and Murray had received and collected from the United States the full amount of four other bonds, numbered, &c., and that Hardenberg, before the commencement of the suit, had deposited thirty-four bonds, numbered, &c., in the Treasury Department for redemption, of which bonds he claimed to have received payment *743 from the Secretary of the Treasury before the service of process upon him in this suit, in respect to which payment and the effect thereof the counsel for the said Birch and Murray, and for the said Hardenberg respectively, desired to be heard, it was ordered that time for such hearing should be given to the said parties.
Both the complainant and the defendants had liberty to apply for further directions in respect to the execution of the decree.
NOTES
[*] Acts of Texas, 1862, p. 45.
[] Texas Laws, 55.
[*] Mr. Justice Paterson, in Penhallow v. Doane's Admrs., 3 Dallas, 93.
[*] Paschal's Digest Laws of Texas, 78.
[] Id. 80.
[] Laws of Texas, 1859-61, p. 11.
[*] Paschal's Digest, 80.
[] Texas Reports of the Committee (Library of Congress), 45.
[*] County of Lane v. The State of Oregon, supra, p 76.
[*] 13 Stat. at Large, 737
[] Ib. 758.
[] Ib. 774-5.
[*] Luther v. Borden, 7 Howard, 42.
[*] 14 Stat. at Large, 428.
[*] 2 Wallace, 118.
[] Brown v. Davies, 3 Term, 80; Goodman v. Simonds, 20 Howard, 366.
[*] See the decree, infra, p. 741.
[*] 2 Crunch, 452.
[*] Prize Cases, 2 Black, 673.