JAMES P. LEAK *v.* THE COMMISSIONERS OF RICHMOND COUNTY.

The distinction between such acts of the State authorities during the recent war as are valid, and such as are not, turns upon the enquiry whether or not they were extraordinary, arising out of the condition of things, and intended to obstruct or modify some part of the policy of the United States in regard to the rebellion, or not.

LEAK *v.* THE COMMISSIONERS OF RICHMOND COUNTY.

Measures taken during that war by parties, whether States, counties or individuals, the object of which was to counteract plans set on foot by the United States for the suppression of the rebellion, were, and are, contrary to the public policy of that Government ; and so, contracts arising out of them, cannot be enforced : *Therefore,*

Notes taken for money lent in 1862 to a county to enable it to provide *salt* for its citizens, and thus avoid one of the penalties of *blockade,* are void.

The present State and County authorities are under no obligation to fulfil contracts made by their predecessors during the rebellion, unless they come within the provisions of the Ordinance of 1865, (October 18th,) "Declaring what laws and ordinances are in force," &c., and that requires such as it validates to be " consistent with allegiance to the United States," which is not true of the transaction in question.

The burden of proving that any act of the State authorities during the late rebellion which may be under debate, was "consistent with allegiance," is, owing to general position of those authorities, upon the party who asserts it.

Transactions like that under consideration fall under the provisions of the Ordinance of 1865, (Oct. 19th,) and the Constitution of 1868, (Art. viii, § 13) *forbidding* the payment of obligations incurred in aid of the rebellion, directly or indirectly.

Those prohibitions are merely declaratory of principles of the common law in regard to contracts, and therefore do not impair the obligation of the *contracts* referred to.

When Acts of Assembly provided that certain orders of the County Courts might be made, *a majority of the justices being present,* the record must show affirmatively a compliance with that condition.

(*State* v. *Powell,* 2 Ire. 275 ; *Pierce* v. *Jones,* 4 Id. 327 ; *State* v. *King,* 5 Id. 203; *Winslow* v. *Comm'rs* of Perquimans, at this term, cited and approved.)

SPECIAL PROCEEDINGS, tried before *Buxton, J.,* at Spring Term 1869 of RICHMOND Court.

The complaint alleged : That at October Term 1862 of the former County Court of that county, the following order was made : " Ordered that H. W. Harrington, Chairman of this Court, be authorized to borrow from banks or individuals the sum of one thousand dollars, to be paid over to L. W. McLaurin Esq., for the purpose of paying for salt, freight and expenses, &c., and that the said Chairman be further

authorized to borrow as aforesaid, from time to time, as may by him be deemed necessary, not exceeding five thousand dollars, to pay for the quotas of salt that may be apportioned to the county by the State-works at Saltville, Va., and pass the same over to said L. W. McLaurin for the purposes aforesaid"; that thereupon, and relying upon said order, the plaintiff, upon the 12th of November 1862, lent to said county two thousand dollars, and received from Harrington two bonds, payable to himself, for one thousand dollars each, referring to the above order, and signed by Harrington as Chairman, &c. Also that no part of such amount had been paid.

The defendants demurred, because:

1. The court had no jurisdiction over the subject matter of the action.

2. The complaint did not state facts sufficient to constitute a cause of action.

After argument, the court declared, as a conclusion of law:

That the contracts of the late rebel authorities of the county of Richmond, of which that before it was one, have no binding, legal obligation upon the present defendants, who are the rightful authorities of the same county; and thereupon allowed the demurrer, and dismissed the complaint.

The plaintiff appealed.

*Ashe, Leitch and Hinsdale* for the appellant.
*N. McKay, contra.*

PEARSON, C. J. This is a special proceeding, under the new mode of procedure, in the nature of a writ of *mandamus*, under the old mode, to compel the authorities of the county of Richmond to pay money lent by the plaintiff to the persons then exercising the powers of the county, to enable them to provide salt for the use of the citizens during the

war.   As evidence of which the plaintiff relies on a note executed by H. W. Harrington, Chairman of the County Court.

The note recites an order of the Court of Pleas and Quarter Sessions, but it no where appears that a majority of the justices of the county were present when the order was made, and there is no averment that such was the fact.

This objection is fatal, for both the ordinance of the convention and the statute on which this transaction is based, give the authority:—"a majority of the justices being present."

This fact must appear affirmatively, it not being a matter within the ordinary powers of the Court of Pleas and Quarter Sessions.    The maxim, *omnia presumuntur* has no application: *State* v. *Powell,* 2 Ire. 275; *Pierce* v. *Jones,* 4 Ib. 327; *State* v. *King,* 5 Ib. 203.

Passing by this objection, and assuming that the Commissioners of a county may be sued, as to which, see *Winslow* v. *Commissioners of Perquimans Co.* at this term, upon the main question there are several views which sustain the objection of his Honor:

1. At the time of the legislative act, giving power to the justices to make the contract, and at the date of the contract, the persons exercising the power of the State, and the persons exercising the power of the county, had disavowed their allegiance, and put themselves in open hostility to the rightful State government, and to the government of the United States.   In other words, there was rebellion.

It follows, that the courts of the rightful State government, which has regained its supremacy, cannot treat the acts of persons so unlawfully exercising the powers of the State and county authority as valid, unless the court is satisfied that the acts were innocent and such as the lawful government would have done.   So when the plaintiff asks the court to compel the defendants, who are in the rightful exercise of the power of the county, to perform a contract made by a set of men who were wrongfully exercising the

power, the onus of showing that the contract was for an innocent purpose, and not made in aid of the rebellion, is upon the plaintiff; if the matter be left in doubt, the courts cannot enforce the claim against the rightful authorities of the county.

So far from being left in doubt, it is clear that the contract was in aid of the rebellion.

Any act which would not have been done except for the existence of the rebellion, and which was calculated to counteract the measures adopted by the government of the United States, for its suppression, and to enable the people in insurrection to protract the struggle, was in aid of the rebellion.

The idea can be more clearly expressed by examples: Statutes sanctioning and protecting marriage and the domestic relations, and Appropriations for the ordinary administration of justice, or for the support of the Lunatic Asylum, are acts having no reference to the rebellion, and would have been done in any event. So, although it may be true that the doing of these things made the condition of the people more endurable, in no fair sense can they be considered, as having been done in aid of the rebellion: On the other hand, Statutes and Appropriations to run the blockade, and introduce for the use of the people, cottoncards and medicine; or to supply the people with salt by erecting works for its production, and providing for its transportation and distribution: whether done directly by the State, or indirectly, through the agency of the county authorities, are acts of a novel and unprecedented character and such as would not have been done except for the existence of the rebellion. So the case is covered by the first requisite in the definition of an act in aid of the rebellion.

That the act of providing salt for the use of the people was calculated to counteract the blockade and other measures of the United States to suppress the rebellion, and to enable the people of the insurgent States to protract the struggle, is a matter too plain for discussion; any one who

attempts to prove the contrary must confess the soft impeachment of allowing his reasoning faculties to be obscured by prejudice and sympathy for "the cause of the South," as it was called on the argument.

Grant seizes a man, in the act of carrying corn and salt into Vicksburg, who says, "the women and children are in a state of actual starvation, and my motive was to do an act of charity and humanity, and mitigate the rigors of war;" the reply is obvious: " The laws of war are paramount to motives of charity and humanity. Starving the citizens was resorted to, in order to compel the authorities to surrender, and you attempt to counteract my measures, and aid them to protract the seige?"

This instance, of a single act of an individual, is given by way of illustration. But when the act is done under the authority of a wrongful government, which had subverted the rightful State government and was in open rebellion, whether it be done directly by the government, or indirectly through the agency of its creatures the wrongful county authorities, the position, that it is done "merely as an act of charity and humanity," and was not calculated to aid the rebellion. carries the evidence of fallacy on its face.

The act, *per se*, did aid the rebellion, and its being done by the wrongful authority, acting as part and parcel of the wrongful State government, organized for the avowed purpose of sustaining the rebellion, tends the more strongly to fix its character.

The Court is not at liberty to shut its eyes to the historical fact, that furnishing salt was not a single act, but was one of a long series of acts in aid of the rebellion: "*noscitur a sociis.*"

The ordinances of the Convention of 1861 assuming legislative powers; the acts of the Legislatures during the war; and the acts of the county authorities, *all*, follow out a common purpose, *to resist the invasion*! A military board is established; appropriations are made to procure clothes

and arms for the soldiers, cotton-cards, medicine, salt, &c., for the people; bounties are offered for volunteers; the powers of the county authorities are enlarged; the counties equip volunteers, and transport their baggage to camp; take measures to provide salt, &c., and give every assurance that the wives and children of soldiers will be cared for; in short, the authorities, both State and county, strain every nerve to "resist the invasion." Witness, the debt of the State and counties accumulated *during the war!*

A change takes place, what was then considered *"resisting an invasion"* turns out to have been *"aiding a rebellion."* Thereupon it is said with seeming seriousness, "certain of these acts ought not to have been entered as items under the head of 'resisting invasion," and should now be transferred and posted as items under a distinct head viz: "charity and humanity !" for such acts were not calculated or intended, either to resist invasion, or to aid rebellion, and did not have that effect !"

In *Texas* v. *White,* 7 Wall. U. S. 700, it is held that "the act of a Military Board in applying bonds belonging to the State, to pay for cotton cards and medicine, for the use of the people of Texas during the war, is void, on the ground that the purchase of these articles was an act in aid of the rebellion; and to the suggestion "that the purchase of cotton cards and medicine, was not a contract in aid of the rebellion," but "for obtaining goods capable of a use entirely legitimate and innocent," the Court merely says " we cannot adopt this view," and reference is made to the fact, that the act was done by a military Board and was only one of a series of acts calculated to aid the rebellion, for the purpose of showing that the question was too plain to admit of discussion.

There is another view of the subject on which his Honor seems to have put his decision: "The rightful authorities of the county are under no obligation to pay a debt contracted by a set of men who were wrongfully exer-

cising the power of the county, and were engaged in open rebellion."

"To meet this objection the plaintiff relies on the ordinance of the Convention 18th October 1865, sec. 4: All the acts and doings of the civil officers of the State, since 20th May 1861, done under, and in virtue of any authority, purporting to be a law of the State, which is consistent with its allegiance to the United States, and with the Constitution of the State, shall be valid, &c."

The question is, was the legislative act conferring power on the Justices of the county of Richmond to contract this debt, consistent with the allegiance of the State to the government of the United States?

There too, the onus is on the plaintiff. The train of reasoning in the first view taken of this case, applies with equal, if not more force to this, and proves clearly that the legislative act, purporting to be a law of the State, under which the Justices contracted this debt, so far from being consistent with the allegiance of the State to the United States, was in aid of resisting the invasion of the United States, as it was then termed, in other words, in aid of the rebellion.

According to these two views, to entitle the plaintiff to judgment, he must satisfy the Court, both in respect to the innocency of the contract,—that it was not calculated to aid the rebellion, or intended to have that effect, and in respect to the legislative act, under which the Justices derived their power to borrow this money,—that it was also innocent and was not calculated and intended to aid the rebellion and protract the struggle. Upon which latter point the "acts and doings" of the Convention of 1861, and of the Legislatures following it, during the war, bear perhaps with greater force, than upon the contract made by the Justices.

The question is against the plaintiff on both points.

There is another view of the question. The people in

Convention (Oct. 1865) ordain "that all debts incurred by the State in aid of the late rebellion, directly or indirectly, are void, and no General Assembly of this State shall have power to assume or provide for the payment of the same or any portion thereof, nor to assume or provide for the payment of any portion of the debts incurred directly or indirectly by the late so-called Confederate States," or by its agents, or under its authority, (Oct. 19th 1865) By the State Constitution : "No county, city, town or other municipal corporation, shall assume or pay, nor shall any tax be levied or collected, for the payment of, any debt, or the interest upon any debt contracted directly or indirectly in aid or support of the rebellion." Art. 7, sec. 13.

Here is a declaration of the will of the people, obligatory upon the courts, that no "war debt" as it is termed, contracted either by the State, or by the counties, or cities, or towns, shall be paid.

The discussion of the subject into which we have entered at large, was considered important, to show, 1st, That furnishing salt to the people during the war was a measure calculated and intended to aid in resisting the invasion, in other words, aiding the rebellion; and 2d. That the ordinance of the Convention of 1865, and the provision of the Constitution are not obnoxious to the charge of impairing the obligations of contracts, for that these contracts, without this provision, could not have been enforced by the courts of the rightful government of the State as now reconstructed, without violating a well settled principle of the common law, and without impairing the integrity of the conditions accepted and acted upon, in restoring the State to its constitutional relations to the government of the United States, as one of the States of the Union.

PER CURIAM.                              Judgment affirmed.