PARKER RAND v. THE STATE OF NORTH CAROLINA.

Where a person was, before the late civil war, the *bona fide* holder of two bonds of the State, which had been issued ten years before for purposes of internal improvements, and which were then due and payable, and in 1862, received from the State in payment thereof treasury notes to the amount of the bonds, which expressed on their face that they were fundable in the bonds of the State, thereafter to be delivered, and the bonds had never been delivered, *it was held,* Rodman, Justice, dissenting, that the claim was founded upon an illegal consideration and the State was not bound to pay it.

The case of *Leak* v. *Commissioners of Richmond,* 64 N. C. Rep. 132, cited and approved.

This is the case of a claim against the State, presented to the Court at this Term for its recommendatory action under Art. 4, sec. 11 of the Constitution. A sufficient statement

of the facts of the case will be found in the opinion of the Court.

*Phillips & Merrimon,* for the claimant.

SETTLE, J. The opinion of this Court is invoked by the claimant, under Art. 4, sec. 11 of the Constitution, with a view to obtain favorable action on his claim by the General Assembly.

The Clerk of this Court, in obedience to an order of reference, reports that the facts set forth in the complaint are true. Do they constitute a valid claim against the State?

The claimant having a legal claim (consisting of State bonds) in 1862 surrendered it and accepted in payment of the same Treasury notes, fundable and interest bearing, issued by the State in pursuance of a policy, evinced by a series of acts commencing in May, 1861, and entitled:

1. "An act to provide ways and means for public defence," ratified the 11th day of May, 1861, and appropriating $5,-000,000.

2. "An ordinance to provide the ways and means for the defence of the State," ratified the 28th day of June, 1861, and appropriating $3,200,000.

3. "An ordinance to provide for the raising of money for the support of the government, and for the issue of Treasury notes for the purpose of paying the public debt and purchasing supplies for the military forces employed for defence in the present war, and for other purposes," ratified 1st December, 1861, and appropriating $3,000,000.

The titles of the Acts, under which these notes were issued, fully informed the claimant of their character, but as they professed to be fundable and interest bearing he, like thousands of others, took the venture and accepted them in payment and discharge of securities, which he surrendered. He was not compelled to this course—he might have retain-

ed his old securities, but he saw proper to exchange non-interest bearing for interest bearing securities, with a full knowledge of what was going on around him.

Had the rebellion, of which this currency was in part the life blood, succeeded, his may have been a good investment, but as it has failed he must share the fate of all who invested their money or rather property in securities of an illegal character.

As the tree has fallen so let it lie. But it is said, that as he has retained the identical notes which he received from the Treasury, the State is bound to make them good. *Non sequitur.*

These notes are not slightly tainted, but spoiled. Not only do the titles of the Acts above cited fix the character of Treasury notes, but a series of other Acts show for what purpose they were brought into existence, and that the authorities of the State were endeavoring to give them currency with the people in order to carry the rebellion to a successful issue.

The Governor was authorized to establish Post offices and Post roads, to establish telegraphic lines, to build forts and arsenals, to provide for the manufacture of arms, to raise and equip volunteers, to furnish salt and other supplies to citizens of this State, to feed troops from other Southern States passing through this State, &c., &c., for all of which he was to draw his warrant upon the Treasury, which as we have seen, had within a few months been almost filled with Treasury notes.

We may safely say that these notes would never have had an existence but for the rebellion.

The Convention of 1865 ordained " that all debts incurred by the State in aid of the late rebellion, directly or indirectly, are void, and no General Assembly of this State shall have power to assume or provide for the payment of the same, or any portion thereof, nor to assume or provide

for the payment of any portion of the debts incurred directly or indirectly by the late so-called Confederate States." And the Constitution Art. I, sec. 6, is to the same effect.

"Any act which would not have been done except for the existence of the rebellion, and which was calculated to counteract the measures adopted by the government of the United States, for its suppression, and to enable the people in insurrection to protract the struggle, was in aid of the rebellion."

"The Courts of the rightful State government, which has regained its supremacy cannot treat the acts of persons so unlawfully exercising the powers of the State and County authority as valid, unless the Court is satisfied that the acts were innocent and such as the lawful government would have done." *Leak* v. *Commissioners of Richmond,* 64 N. C. 132. Public policy demands at least this much. And indeed it is no more than every one expected, and is only the same rule that the Legislature laid down in a resolution ratified the 9th day of May, 1861, and which would undoubtedly have been carrried out to the letter if affairs had not taken a different turn. The resolution was as follows :

"WHEREAS, Abraham Lincoln has been and is still endeavoring to raise money upon the faith and credit of the so-called United States government, for the purpose of waging a wicked, unjust, and unholy and unconstitutional war upon the Southern States ; and whereas, North Carolina is neither morally nor legally bound to pay or in any wise contribute to the payment of any debt incurred by said government since the 4th day of March last. Now, therefore, to the end that there may be no misapprehension on the part of those who may invest their means in the securities of said government, it is hereby

*Resolved,* That North Carolina ought never, in any event, to pay any portion of the debt incurred by what is called the United States government, since the 4th day of March last,

or any portion of any debt or liability which may be incur-red hereafter."

The common law, the ordinance of 1865, the Constitution and the decisions of this Court in *Leak* v. *Commissioners of Richmond,* and other cases effectually close the door against the present claim.

Were it admitted, it would open the door to a deluge of war claims, in comparison with which our present indebtedness is but a trifle.

We recommend the rejection of the claim.

PER CURIAM.—The rejection of the claim recommended.

RODMAN, J. *dissenting.* I think a State is always under a moral liability for its debts. Such liability is acknowledged in our Bill of Rights. In this case it is not denied that the petitioner had, at one time, a just debt which has never been paid except in the notes of the State, which, although issued during the war, were not issued to him at least for the purposes of the war. He does not seem to be tainted with any illegal complicity. I do not concur, therefore, in the opinion of the majority of the Court.