## SALISBURY HUBBARD & CO. *vs.* HARNDEN EXPRESS CO.

The defendants, an express company in New York, received from the plaintiffs, April 10, 1861, certain goods to be sent to one C. at Rome, Georgia, and gave a receipt specifying that they were to be sent to the defendants' agency nearest their destination. They arrived at Savannah, Georgia, about the last of April, when they were taken possession of by an officer of the (so-called) Confederate Government, and placed in a bonded warehouse, and subsequently sold for non-payment of duties levied on them, after C. had been notified that they would be sold unless he paid the duties. *Held,* that the defendants had been deprived of the goods by the acts of public enemies, and consequently were not liable to the plaintiffs for their value.

Civil war defined, and the beginning of the late rebellion determined.

The burden of proof is on a common carrier after a loss is shown, to show that it was by one of the excepted perils for which carriers are not liable. The plaintiff may then show that the loss might have been avoided by reasonable skill and attention, but the burden of proof is on him to establish the negligence.

ASSUMPSIT against the defendants, an express company, as common carriers, to recover the sum of $639.66, being the alleged value of a box of watches and jewelry sent by the plaintiffs from New York, to be delivered by the defendants to one E. S. Cobb, in Rome, Georgia, upon receipt from him of the price. A jury trial having been waived, the case was submitted to the court both in fact and law. The facts of the case are stated in the opinion of the court.

*Browne*, for plaintiffs.

*Hart*, for defendants.

POTTER, J. The plaintiffs claim that they on the 10th day of April, A. D. 1861, delivered to the defendants, an express company, in New York, certain goods to be sent to one Cobb, at Rome, in Georgia. The receipt expresses that they are to be forwarded to the agency nearest the destination only, and also provides that the defendants shall not be held liable for loss unless so specified in the receipt. The package was marked collect on delivery, and instructions given not to deliver until paid.

C. H. Bulkley, at Savannah, testifies that the goods arrived at Savannah about the last of April, that they were immediately taken possession of by a customs officer of the Confederate Government and placed in a bonded warehouse. On the 24th October he wrote to Cobb that they were there, and would be sold unless he paid the duties; that they were afterwards sold, and that the 'express company could not return them. Accompanying the package was a bill, and an affidavit of one of the plaintiffs, that the goods were *bonâ fide* the property of Cobb. Bulkley says that this was necessary in order to pass the customhouse. There is also a letter from plaintiffs to defendants April 10, directing them to notify Cobb that there was a package for him at the custom-house, " or if they can be sent and if they are returned [to see that] we do not lose by payment of duties; we don't want to pay tariff : do not give up the goods without being sure of the cash."

J. Stuart, one of defendants' agents, testifies that they had had an agency in Augusta, but that in April their line terminated at Savannah, and that they had been notified that their interior lines had all been closed in March.

The plaintiffs claim that the defendants were bound to deliver the goods and to collect the money, or to return the goods. The defendants contend that the delivery was prevented by the act of the Confederate Government, at that time at war with and public enemies of the United States Government; that they were seized by the customs officers of that government for duties; that Cobb was notified and did not attend to it; and that the goods were sequestrated and sold by the Confederate States Government; that they were bound by instructions not to deliver until they were sure of the cash; and that the amount had been garnisheed in their hands under the Southern sequestration act, so that they could not return the money to the plaintiffs if they had received it. The plaintiffs on the other hand contend that the people of Georgia were rebels only, and not public enemies within the meaning of the law. By the common law, common carriers were liable for all losses except those arising from the act of God or of the king's enemies; and it was undoubtedly the rule that losses from mere mobs, rioters, or insurgents, were not within this exception. Story on Bailments, § 526; *Forward* v. *Pittard*,

1 T. R. 27; *S. C.* 1 Mod. 85; *Barclay* v. *Y. Gana*, 3 Doug. 389. And so under the law relating to treason, a rebel was not deemed an enemy, although assisting rebels was still treason, as levying war. 6 Dane Abr. 697; 1 Hale P. C. 164. An enemy must be the subject of some foreign prince who owes no allegiance to the crown of England. 4 Bl. Com. 83.

The war which has just ended in the United States would undoubtedly be called a great civil war. To characterize it as what publicists would call popular commotion, mob, riot, or sedition, would be ridiculous. It would not be right, also, to class it as what is ordinarily called an insurrection. It was a civil war, and one of the greatest magnitude known in history.

The term civil war is sometimes and perhaps anciently more commonly used to denote a contest in arms between two great parties in the state for the control of the state, but without any design of separation. But the definition has been more extended in modern times. Our civil war was also a territorial war. The Southern party was for some years in absolute possession and control of a large territory, with a regularly organized government and courts. On the borders there were portions of territory where both parties claimed possession, and both sides organized governments.

The language of Vattel has been so often quoted by writers of all parties, by publicists, and by our own courts, that it may be regarded as authoritative, and we therefore quote it: —

" It is a question very much debated whether a sovereign is bound to observe the common laws of war towards rebellious subjects who have openly taken up arms against him ? A flatterer, or a prince of a cruel and arbitrary disposition, will immediately pronounce that the laws of war were not made for rebels, for whom no punishment can be too severe. Let us proceed more soberly, and reason from the incontestable principles above laid down." Vattel Law of Nations, Chitty's ed., with notes by Ingraham, Philad. 1854, book 3, ch. 18, p. 421.

" Custom appropriates the term of ' civil war ' to every war between the members of one and the same political society. If it be between part of the citizens on the one side and the sovereign, with those who continue in obedience to him, on the other, — provided the malcontents have any reason for taking up

arms, nothing further is required to entitle such disturbance to the name of civil war, and not that of rebellion. This latter term is applied only to such an insurrection against lawful authority as is void of all appearance of justice. The sovereign, indeed, never fails to bestow the appellation of rebels on all such of his subjects as openly resist him; but when the latter have acquired sufficient strength to give him effectual opposition, and to oblige him to carry on the war against them according to the established rules, he must necessarily submit to the use of the term 'civil war.'" Ibid. p. 424.

" A civil war breaks the bands of society and government, or, at least, suspends their force and effect; it produces in the nation two independent parties, who consider each other as enemies, and acknowledge no common judge. Those two parties, therefore, must necessarily be considered as thenceforward constituting, at least for a time, two separate bodies, two distinct societies. Though one of the parties may have been to blame in breaking the unity of the state and resisting the lawful authority, they are not the less divided in fact. Besides, who shall judge them? who shall pronounce on which side the right or the wrong lies? On earth they have no common superior. They stand therefore in precisely the same predicament as two nations who engage in a contest, and, being unable to come to an agreement, have recourse to arms."

" This being the case, it is very evident that the common laws of war — those maxims of humanity, moderation, and honor, which we have already detailed in the course of this work — ought to be observed by both parties in every civil war. For the same reasons which render the observance of those maxims a matter of obligation between state and state, it becomes equally and even more necessary in the unhappy circumstance of two incensed parties lacerating their common country." Ibid. p. 425.

" But when a nation becomes divided into two parties absolutely independent, and no longer acknowledging a common superior, the state is dissolved, and the war between the two parties stands on the same ground, in every respect, as a public war between two different nations. Whether a republic be split into two factions, each maintaining that it alone constitutes the body of the state, — or a kingdom be divided between two com-

petitors for the crown, — the nation is severed into two parties, who will mutually term each other rebels.

" Thus there exist in the state two separate bodies, who pretend to absolute independence, and between whom there is no judge. They decide their quarrel by arms, as two different nations would do. The obligation to observe the common laws of war towards each other is therefore absolute, indispensably . binding on both parties, and the same which the law of nature imposes on all nations in transactions between state and state." Ibid. p. 427. And see Reports Com. Foreign Affairs, House Rep. U. S. March 19, 1822, in Gale & Seaton's Folio State Papers, Foreign Affairs, vol. 4, p. 848.

" A civil war " (says Wheaton, everywhere recognized as authority) between the different members of the same society is what Grotius calls a mixed war; it is according to him public on the side of the government, and private on the part of the people resisting its authority. But the general usage of nations regards such a war as entitling both the contending parties to *all the rights of war as against each other*, and even as respects neutral nations." Part 4, chap. 1, § 7. And this passage is quoted by the U. S. Supreme Court in their decision in the *Prize Cases* in 2 Black, 635.

So far as affects foreign nations, all public writers agree that a civil war is to be regarded in the same light as any other war. When the Central and South American Colonies revolted from Spain, our government resisted the claims of Spain to close their ports by municipal law, and denied their right to do it in any other way than by an effective blockade. John Quincy Adams, Secretary of State, denounced this claim of Spain as " an absurd pretension," and " an outrage upon the rights of all neutral nations." Letter of April 28, 1823, to Mr. Nelson, U. S. Minister in Spain. See also Report of Com. on Foreign Affairs of U. S. House of Rep. Jan. 31, 1835. And as regards foreign nations, our government must acknowledge it to be a war. So long as they were regarded as mere revolutionists, our government would be liable for injuries done by them to the commerce of foreign nations. By conceding belligerent rights, the United States were saved from this liability. Letters of Mr. Canning and Mr. Adams, quoted in Lawrence's Wheaton, 44. And if it

was not a war, the United States had no right to search for contraband of war.

And so as respects the relations of the two parties at home. There can be no belligerent rights without war. But there is a difference between such a case and that of alien enemies. The right of the old government to punish for treason after the suppression of a rebellion is entirely a different matter. This right remains, and its exercise is a question of policy for the conquerors to determine. And so far as our late civil war is concerned, we think not only the principles of natural and international law as gathered from the text writers, but the decisions of the courts, justify us in holding that while the war was raging the parties were as to each other entitled to all the rights of public war. See Halleck, ch. 14, §§ 24 and 25.

In the *Prize Cases*, 2 Black, 635, the U. S. Supreme Court held that to constitute a war it is not necessary the two parties should be acknowledged as independent states; that when the party in rebellion declare their independence, and commence hostilities, &c., the contest is a war; that as civil war is never publicly proclaimed, its existence is a fact which the court is bound to notice; that it is not less a civil war because one side may call it an insurrection and insurgents be considered as rebels; that in organizing this rebellion they have acted as states claiming to be sovereign; that the ports and territory of several states are held in hostility to the United States Government; it has a boundary marked by lines of bayonet; and that they are none the less enemies because they are traitors.

In *Thorington* v. *Smith* (1868), 8 Wal. 1, 10, 12, Chief Justice Chase says the Southern Government was not lawful, but was none the less actual and supreme, and the people in legal contemplation were in the same condition as if the country was occupied and controlled by a foreign power.

In *The Santissima Trinidad*, one of the cases which grew out of the civil war between Spain and her colonies, 7 Wheat. 305, it was held that the existence of civil war gives to both parties all the rights of war against each other. And in *The Bello Corrunes*, 6 Wheat. 152, 171, it was held that the civil war between Spain and her colonies was a war in the sense of the word in our treaty with Spain.

Judge Betts, in *The Hiawatha & others*, Bl. Pr. Cas. 1, says : " They are enemies by open hostilities ; they are enemies of the government notwithstanding their residence within the United States."

And in the *Prize Cases*, 2 Black, 635, Mr. Justice Nelson, delivering the opinion of four of the judges, says, " that the existence of civil war when recognized draws after it all the consequences of public war ; and there is nothing in the opinion of the majority inconsistent with this." And this doctrine is recognized by the Court of Chancery in Kentucky, in *Allen* v. *Russell*, A. D. 1864, and by the Court of Appeals of Kentucky, 1863, in the case of *Norris* v. *Donniphan*, 4 Met. (Ky.) 385.

In *Ware* v. *Hylton*, 3 Dall. 199, 224, in the U. S. Supreme Court, Judge Chase (who was one of the signers of the Declaration of Independence), speaking of the Revolution of 1776, says that before the Declaration of Independence, the contest was a civil war, but thereupon it became a public war, and each party became entitled to all the rights of public war. The other judges who delivered their opinions raised no question as to this.

And Judge Betts, in the case of *The Tropic Wind*, Bl. Pr. Cas. 64, says : " I do not find, on examination of the writers on public law, any difference as to belligerent rights in civil or foreign wars. The rights and responsibilities of the defendants in this action must be determined by the laws of war regulating *public wars* between foreign states." *Hughes* v. *Litsey*, Circuit Court, Kentucky. See also *Billgery* v. *Branch & Sons*, 19 Grat. 393 ; *Dole* v. *N. E. Mutual Marine Ins. Co.* 2 Clifford, 394, 422 ; *S. C.* 6 Allen, 373.

*Bland* v. *Adams Exp. Co.*, A. D. 1864, 1 Duval, 232. The railroad cars in which the express carried their goods were attacked in 1862, and burnt by Morgan's band of Confederate soldiers. Judge Robertson (afterwards chief justice) delivered the opinion of the Court of Appeals that they were in the technical sense public enemies. It was a civil war. " History records no civil war more flagrant or gigantic than that in which our country is now engaged. If this be not war, what is war ? " &c., &c.

In a case in the Circuit Court of Kentucky, *Hughes* v. *Litsey*, which was a suit for property taken by the Confederate army, it

was held that a private soldier could rely upon the belligerent rights of the late confederacy as a defence. The court say the question resolves itself into the inquiry whether the laws of war were to be applied to the contest; is it to be considered as a civil war, or a mere rebellion? If it be recognized as a civil war, there is no difference between the usages observed in civil or foreign wars. (Citations.) The "action must be determined by the laws of war regulating *public wars* between foreign states."

In *The Southern Express Co.* v. *Womack*, 1870, 1 Heiskell, 256, defendant had taken goods to carry from near Richmond, Va., to Lynchburg, &c., and they were destroyed by the United States forces. Were the United States public enemies against whom defendant did not insure? Although the United States were the rightful government, held, that the United States troops were public enemies, in the sense of the contract made between the parties.

In *Patterson* v. *N. C. R. R. Co.* 64 N. C. 147, where both parties were residents of the Confederate States and recognizing its control, the goods were destroyed by the Confederate soldiers. Held, not public enemies as regarded the parties to the suit.

And in the case of *Holladay* v. *Kennard*, 12 Wal. 254, which was an action against a stage and express company, captured by Indians near Julesburg, in 1865, the court below charged that the Indians were public enemies, and the defendant exonerated, unless negligent, and the U. S. Supreme Court speak of them as public enemies, but the case was decided upon the question of negligence.

In *Smith* v. *Braselton*, Supreme Court of Tennessee, A. D. 1870, 1 Heiskell, 44, 55, the court, after a full citation of authorities, hold that the war was in its technical sense a *public war*, and that the parties maintained the same relations towards each other as independent nations in a public war; that the belligerent rights of the two parties were precisely the same; and that it is wrong to say they were accorded merely from motives of humanity. As soon as it was recognized as a civil war, these rights existed under the law of nations, subject of course to the rights of the old government, if successful, to punish for treason. And the Secretary of State, in a letter of May 16, 1861, in

regard to purchase of vessels, denominates them *public enemies*. Moore's Reb. Rec. vol. 1, Doc. p. 258. And see his dispatches, *passim*, as to the extent and greatness of the war. And on no other principle than that of their being public enemies in a territorial (although civil) war, could the rule announced by the U. S. Supreme Court in the case of *Mrs. Alexander's Cotton*, 2 Wal. 404, 419, and other cases, that *all* the people of every state or district in insurrection should be deemed enemies, be justified.

Another question may arise : When the civil war is ended by the suppression of the rebellion, how far is the old government bound to treat the acts of the rebel *de facto* government as valid ?

In the cases of *Texas* v. *White*, 7 Wal. 700, 732, A. D. 1868, and in *Thorington* v. *Smith*, 8 Wal. 1, 10, A. D. 1868, Chief Justice Chase draws a distinction between those acts of the rebel government *de facto* which will be recognized as valid after the suppression of the rebellion, and those which are to be treated as of no validity.

And the Supreme Court of North Carolina, A. D. 1870, in the case of *Leak* v. *Commissioners of Richmond*, 64 N. C. 132, make a similar distinction. But we do not think the present case is affected by that consideration.

If, then, during the late civil war, the rebels were for certain purposes to be allowed the rights of public enemies, when did this state of affairs commence ?

The formal secession of South Carolina took place December 20, 1860 ; that of Georgia on January 19, 1861. December, 1860, the Confederate Constitution was formed. December 26, the U. S. troops were removed from the other forts at Charleston to Fort Sumter ; and on December 28, the Confederates took possession of the abandoned forts and the U. S. Customhouse, and December 30, took the U. S. Arsenal. January 3, 1861, they took Fort Pulaski at Savannah ; and on January 24, the U. S. Arsenal at Augusta, Ga., surrendered to them. After a siege of some time, on April 12, the bombardment of Fort Sumter began, and it was evacuated on the 14th ;[1] and on

---

[1] Dispatch of Major Anderson. Moore's Rebellion Record, vol. 1, Doc. p. 76.

April 15, President Lincoln issued his proclamation declaring that the rebellion had assumed dimensions beyond the power of judicial proceedings to suppress, and calling out the militia, followed April 19, by other proclamations of blockade, &c.

As Mr. Dana, in note 32 to his edition of Wheaton, p. 84, says: "The Confederate Government became at once firmly established in the eleven states, organized in all its parts, and assumed the position of an independent nation."

In a case before the U. S. Supreme Court, *The Protector*, 12 Wal. 700, Chief Justice Chase, asking when did the rebellion begin, answers, that acts of hostility began at different places at different times, and therefore it was difficult to say when it began; but as in that case it was necessary to fix the time when the statute of limitations was suspended, the court decided to assume April 19, the date of the proclamation of blockade, as the date for that purpose in South Carolina and Georgia. In the present case there is no evidence that the goods arrived at Savannah before the last of April, and therefore it is not material to inquire more particularly.

The rule laid down by Lord Coke, 1st Inst. lib. iii. cap. 6, § 412 [249 b], has been recognized by so many courts and writers, that it has become a part of settled international law so far as relates to civil law. "When the courts of justice be open, and the judges and ministers of the same may by law protect men from wrong and violence and distribute justice to all, it is said to be time of peace. So when by invasion, insurrection, rebellion, or such like, the peaceable course of justice is disturbed and stopped so as the courts be, as it were, shut up (*et silent inter arma leges*), then it is said to be time of war." Lawrence's Wheaton, page 525, note 171; 3 Phillimore's Int. Law, *740. Recognized in *Harger* v. *Abbot*, 6 Wal. 532, 541, and *Prize Cases*, 2 Black, 665.

Allegiance and protection are reciprocal duties, and when a state is unable to protect a portion of its territory from the superior force of an enemy, it loses its claim to the allegiance of those whom it fails to protect, &c. Halleck, ch. 32, § 14; Judge Story in *U. S.* v. *Rice*, 4 Wheat. 246, 254.

And so far as the fact that these goods were seized for customs duties imposed by the Confederate Government may affect

the case, it was held by the U. S. Supreme Court, per Story, J., in the case of *U. S.* v. *Rice*, 4 Wheat. 246, 254, in a case where goods had been imported into Castine, while occupied by the British, then at war with us, and had paid duties to the British, who had established a custom-house there, that Castine, while so occupied, was to be deemed a foreign country so far as revenue laws were concerned, and that such goods were not subject to United States duties, but only to such as the British Government chose to impose. The sovereignty of the United States was suspended over that territory, and the inhabitants passed under a temporary allegiance to the British Government, and were bound by such laws and such only as they chose to impose. "From the nature of the case no other laws could be obligatory upon them, for where there is no protection, or allegiance, or sovereignty, there can be no claim to obedience."

The burden of proof, after a loss is shown, is on the carrier to show that it was by one of the excepted perils; and it would then be competent for the plaintiff to show that the loss might have been avoided by reasonable skill and attention. But the burden of proof would be on the plaintiff to establish the negligence, and if on the whole it be left in doubt what the cause of loss was, and if it may as well be attributed to the excepted peril as to the negligence, then the plaintiff cannot recover. U. S. Sup. Court, by Judge Nelson, in *Clark, &c.* v. *Bramwell, &c.* 12 How. U. S. 272, 280, quoting as a part of his opinion the language of Lord Chief Justice Denman, in *Muddle* v. *Stride*, 9 Car. & P. 380; also *Rich et al.* v. *Lambert*, 12 How. U. S. 347, 357.

In this case the deposition of Bulkley does not show whether he was agent for defendants, or for some other company; but from Cobb's letter and statements of counsel, we infer that the goods had been passed over by defendants to the Southern Express Company, but whether before or after seizure does not appear, excepting that Bulkley says they arrived the last of April, and were immediately taken possession of. If the defendants had needlessly carried the goods within reach of seizure for Confederate duties, the case would be different; but the plaintiffs' instructions show that the goods were to go to a place in the rebel territory; that they knew of the organization of the Con-

federate Government, and that duties would have to be paid; and they were to notify Cobb that the goods were at the custom-house, unless they found that they could be sent to him without risk of the plaintiff having to pay duties in case of their not being taken and paid for by Cobb. "We don't want to pay tariff." They did notify Cobb in time for him to have paid the duties if he had chosen to do so; the reasons for his not doing so may be inferred from the state of the country and from the Confederate sequestration act. And there is no evidence that it would have been of any use for the defendants to resist the seizure. The United States forces were withdrawn and the Confederate Government established. We consider therefore that the defendants have brought their case within the exception of public enemies, and that there is no sufficient evidence of negligence, and therefore    *Judgment must be for the defendants.*